UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JOHN BAUMANN,

                 Plaintiff,

v.                                                                               9:05-CV-0690
                                                                                 (FJS/GHL)
DOCTOR BUTTARAZZI; DR. JERRY BARTLESON;
and LESTER WRIGHT, M.D., M.P.H.,

                 Defendants.
_____

APPEARANCES:                                          OF COUNSEL:

OFFICE OF CRAIG J.J. SNYDER, P.C.                     CRAIG J.J. SNYDER, ESQ.
  Counsel for Plaintiff
17 Grandview Street
East Stroudsburg, PA 18301

HON. ANDREW M. CUOMO                                  SENTA B. SIUDA, ESQ.
Attorney General for the State of New York            Assistant Attorney General
  Counsel for Defendants
615 Erie Boulevard West, Suite 102
Syracuse, NY 13204-2455

GEORGE H. LOWE, United States Magistrate Judge

## REPORT-RECOMMENDATION

      This prisoner civil rights action, commenced through counsel pursuant to 42 U.S.C. §

1983, has been referred to me for Report and Recommendation by the Honorable Frederick J.

Scullin, Jr., Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule

72.3(c) of the Local Rules of Practice for this Court.  Generally, John Baumann ("Plaintiff")

alleges that, when he was an inmate in the custody of the New York State Department of

Correctional Services ("DOCS") between November 2, 2001, and January 27, 2005, three

employees of DOCS–Drs. Patrick J. Buttarazzi, Jerry R. Bartleson, and Lester N. Wright

("Defendants")–violated his rights under the Eighth Amendment by being deliberately indifferent

to his serious medical need for treatment for his Hepatitis C viral infection.  (*See generally* Dkt.

No. 4, ¶¶ 8-48 [Plf.'s Am. Compl., dated Jan. 27, 2005].)  Currently pending before the Court is

Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56.  (Dkt. No. 39.)  For

the reasons that follow, I recommend that Defendants' motion be granted.

## I.    BACKGROUND

### A.    Summary of Plaintiff's Amended Complaint

Liberally construed, Plaintiff's Complaint alleges as follows.[1]

Between November 2, 2001, and January 27, 2005, Plaintiff was an inmate in the custody

of DOCS at Cayuga Correctional Facility ("Cayuga C.F.").  (Dkt. No. 4, ¶¶ 3-5, 7, 10, 14 [Plf.'s

Am. Compl., dated Jan. 27, 2005].)[2]  During that time, Plaintiff suffered from Hepatitis C.  (*Id*. at

---

[1]    I note that, in construing Plaintiff's claims, I have afforded Plaintiff's Complaint the liberal construction that all pleadings must be afforded, under Fed. R. Civ. P. 8.  *See* Fed. R. Civ. P. 8(f) ("All pleadings shall be so construed as to do substantial justice.").  Moreover, I have afforded his Complaint the extra-liberal construction appropriate for pleadings asserting civil rights claims (which is similar to the extra-liberal construction appropriate for pleadings drafted by *pro se* litigants).  *See Mian v. Donaldson*, 7 F.3d 1085, 1087 (2d Cir. 1993); *McCray v. City of New York*, 03-CV-9974, 2007 WL 435278, at *30 (S.D.N.Y. Dec. 11, 2007); *cf. Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998) ("This rule [requiring courts to accept the materials allegations of a complaint as true on a motion to dismiss for failure to state a claim] applies with particular force where the plaintiff alleges civil rights violation or where the complaint is submitted *pro se*.") [citations omitted].

[2]    I note that, in one paragraph of his Amended Complaint, Plaintiff alleges that he "was and remains an inmate at the *Mid-Orange* Correctional Facility from on or about October 31, 2001 until the present."  (*See* Dkt. No. 4, ¶ 8 [Plf.'s Am. Compl.] [emphasis added].  In light of Plaintiff's numerous factual allegations to the contrary (i.e., alleging that he was an inmate at Cayuga C.F. during the time in question), I construe this use of the word "Mid-Orange" to be a typographical error.

¶¶ 8-9, 11, 13, 16, 17, 19, 20.)

Defendant **Buttarazzi**, while employed by DOCS to provide medical care to inmates at Cayuga C.F., intentionally or recklessly failed to treat Plaintiff's Hepatitis C condition between **November 2, 2001**, and **March 5, 2003**, for reasons other than medical necessity, despite Plaintiff's repeated requests for that treatment and his repeated complaints of suffering from the adverse health effects of not having that treatment.  (*Id*. ¶¶ 4, 8-13, 19-29.)

Defendant **Bartleson**, while employed by DOCS to provide medical care to inmates at Cayuga C.F., intentionally or recklessly failed to treat Plaintiff's Hepatitis C condition between **March 5, 2003**, and **January 27, 2005**, for reasons other than medical necessity, despite Plaintiff's repeated requests for that treatment and his repeated complaints of suffering from the adverse health effects of not having that treatment.  (*Id*. ¶¶ 5, 8, 9, 14-16, 19-21, 30-37.)

Defendant **Wright**, while employed by DOCS as its Deputy Commissioner and Chief Medical Officer in Albany, New York, during the time in question (between November 2, 2001, and January 27, 2005) was personally involved in the deliberate indifference to Plaintiff's serious medical need for Hepatitis C treatment in one or both of two ways: (1) he created, and/or allowed the continuance of, the DOCS policy or custom upon which Defendants Buttarazzi and Bartleson relied when they refused to treat Plaintiff's Hepatitis C condition for reasons other than medical necessity; and/or (2) he failed to cause Plaintiff to receive Hepatitis C treatment despite receiving at least one written complaint by Plaintiff that he was not receiving the Hepatitis C treatment he needed.  (*Id*. ¶¶ 6, 8, 9, 17, 18-21, 38-48.)

**B.      Summary of Defendants' Legal Arguments**

Defendants' motion for summary judgment is premised on the following four grounds: (1) any claims asserted by Plaintiff against Defendants in their official capacities should be dismissed under the Eleventh Amendment; (2) Plaintiff's claims should be dismissed because, on the current record, Defendants are protected from liability as a matter of law by the doctrine of qualified immunity; (3) Plaintiff's claim against Defendant Wright should be dismissed because Plaintiff has failed to adduce any record evidence establishing that Defendant Wright was personally involved in the constitutional violations alleged; and (4) Plaintiff's claims should be dismissed because he has failed to adduce any record evidence establishing that either (a) he suffered from a sufficiently serious medical need during the time in question, or (b) Defendants acted with a sufficiently culpable state of mind with regard to that need. (Dkt. No. 39, Part 16, at 5-22 [Defs.' Memo. of Law].)

## II.      APPLICABLE LEGAL STANDARD

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of material[3] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.[4]

---

[3]      A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

[4]      *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) [citation omitted]; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) [citation omitted].

4

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial."[5]  The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts."[6]  Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[7]

It should be noted that, where a non-movant fails to adequately oppose a properly supported factual assertion made in motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.[8]  Moreover, to be

---

[5]     Fed. R. Civ. P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations . . . of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).

[6]     Fed. R. Civ. P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations . . . of the [plaintiff's] pleading . . . ."); *Matsushita*, 475 U.S. at 585-86; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

[7]     *Ross v. McGinnis*, 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N.Y. Mar. 29, 2004) [internal quotations omitted] [emphasis added].

[8]     *See Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) ("We agree with those circuits that have held that Fed. R. Civ. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord*, *Lee v. Alfonso*, No. 04-1921, 2004 U.S. App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g*, 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N.Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak*, 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for

sufficient to create a factual issue for purposes of a summary judgment motion, statements made in an affidavit or deposition testimony must (among other things) not be conclusory.[9]  Such statements are conclusory if, for example, their assertions lack any supporting evidence or are too general.[10]

## III.   ANALYSIS

### A.   Whether Any Claims Asserted by Plaintiff Against Defendants in Their Official Capacities Should Be Dismissed Under the Eleventh Amendment

As stated above in Part I.B. of this Report-Recommendation, Defendants argue that any claims asserted by Plaintiff against Defendants in their official capacities should be dismissed under the Eleventh Amendment.  (Dkt. No. 39, Part 16, at 5 [Defs.' Memo. of Law].)  In his

---

summary judgment); *Govan v. Campbell*, 289 F. Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan*, 253 F. Supp.2d 369, 371-372 (N.D.N.Y. 2003) (Hurd, J.).

[9]     *See* Fed. R. Civ. P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson*, 375 F.3d at 219 (2d. Cir. 2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate v. Top Assoc.*, 425 F.2d 92, 97 (2d Cir. 1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

[10]     *See, e.g.*, *Bickerstaff v. Vassar Oil*, 196 F.3d 435, 452 (2d Cir. 1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.*, 78 F.3d 61, 63 (2d Cir. 1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon*, 759 F.2d 989, 997 (2d Cir. 1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places. . . .  It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e]), *cert. denied*, 474 U.S. 829 (1985); *Applegate*, 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

Response Memorandum of Law, Plaintiff responds to each of Defendants' legal arguments *except*

their argument that any claims asserted by Plaintiff against Defendants in their official capacities

must be dismissed under the Eleventh Amendment.  (Dkt. No. 44, Part 7, at 10-25 [Plf.'s

Response Memo. of Law].)

 Where a plaintiff has failed to respond to a defendant's properly filed and facially

meritorious memorandum of law (submitted in support of its motion for summary judgment), the

plaintiff is deemed to have "consented" to the legal arguments contained in that memorandum of

law under Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court.[11]  Stated another

way, where a defendant has properly filed a memorandum of law (in support of a properly filed

motion for summary judgment), and the plaintiff has failed to respond to a legal argument

asserted in that memorandum of law, the only remaining issue is whether that legal argument is

---

 [11] N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown."); N.D.N.Y. L.R. 7.1(a) (requiring opposition to motion for summary judgment to contain, *inter alia*, a memorandum of law); *cf*. Fed. R. Civ. P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's *response* . . . must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so *respond*, summary judgment, if appropriate, shall be entered against the adverse party.") [emphasis added]; *see*, *e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

*facially meritorious*.[12]  A defendant's burden in making legal arguments that are facially

meritorious has appropriately been characterized as "modest."[13]

Here, I find that Defendants' Eleventh Amendment immunity argument is, at the very

least, facially meritorious.  Moreover, even if I were to scrutinize Defendants' argument under the

more rigorous standard appropriate when an argument is opposed, I would find that Defendants'

argument has merit.  The Eleventh Amendment has long been construed as barring a citizen from

bringing a suit against his or her own state in federal court, under the fundamental principle of

---

[12]     *Hernandez v. Nash*, 00-CV-1564, 2003 U.S. Dist. LEXIS 16258, at *7-8
(N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before a motion to dismiss may be granted under
Local Rule 7.1[b][3], "the court must review the motion to determine whether it is *facially
meritorious*") [emphasis added; citations omitted]; *accord*, *Topliff v. Wal-Mart Stores East LP*,
04-CV-0297, 2007 U.S. Dist. LEXIS 20533, at *28 & n.43 (N.D.N.Y. March 22, 2007) (Lowe,
M.J.); *Hynes v. Kirkpatrick*, 05-CV-0380, 2007 U.S. Dist. LEXIS 24356, at *5-6 & n.2
(N.D.N.Y. March 21, 2007) (Lowe, M.J.); *Sledge v. Kooi*, 04-CV-1311, 2007 U.S. Dist. LEXIS
26583, at *28-29 & n.40 (N.D.N.Y. Feb. 12, 2007) (Lowe, M.J.), *adopted by* 2007 U.S. Dist.
LEXIS 22458 (N.D.N.Y. March 28, 2007) (McAvoy, J.); *Kele v. Pelkey*, 03-CV-0170, 2006 U.S.
Dist. LEXIS 95065, at *5 & n.2 (N.D.N.Y. Dec. 19, 2006) (Lowe, M.J.), *adopted by* 2007 U.S.
Dist. LEXIS 4336 (N.D.N.Y. Jan. 22, 2007) (Kahn, J.).

[13]     *See Ciaprazi v. Goord*, 02-CV0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec. 22,
2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for
summary judgment as "modest") [citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-324
(1986)]; *accord*, *Saunders v. Ricks*, 03-CV-0598, 2006 WL 3051792, at *9 & n.60 (N.D.N.Y.
Oct. 18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.), *Smith v. Woods*, 03-
CV-0480, 2006 WL 1133247, at *17 & n.109 (N.D.N.Y. Apr. 24, 2006) (Hurd, J., adopting
Report-Recommendation of Lowe, M.J.); *cf. Race Safe Sys. v. Indy Racing League*, 251 F.
Supp.2d 1106, 1109-1110 (N.D.N.Y. 2003) (Munson, J.) (reviewing whether record contradicted
defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed
motion to dismiss, under Local Rule 7.1[b][3]); *Wilmer v. Torian*, 96-CV-1269, 1997 U.S. Dist.
LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule
7.1[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to
dismiss *and* the reasons set forth in defendants' motion papers*), adopted by* 1997 U.S. Dist.
LEXIS 16340, at *2 (N.D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord*, *Carter v. Superintendent
Montello*, 95-CV-989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd,
M.J.), *adopted by* 983 F. Supp. 595 (N.D.N.Y. 1996) (Pooler, J.).

"sovereign immunity."[14]  The Eleventh Amendment also bars a suit (including an action pursuant to 42 U.S.C. § 1983) against a state official acting in his *official* capacity.[15]  This is because "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. . . .  As such, it is no different from a suit against the State itself. . . ."[16]  To the extent that Plaintiff sues Defendants in their official capacities, his claims must be dismissed for lack of subject-matter jurisdiction.[17]  I note that Plaintiff's Amended Complaint alleges that Defendants were employed by New York State during the time in question.  (Dkt. No. 4, ¶¶ 4-6 [Plf.'s Am. Compl.].)

---

[14]      *See* U.S. Const. amend XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *Hans v. Louisiana*, 134 U.S. 1, 10-21 (1890); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) [citation omitted].

[15]      *See Severino v. Negron*, 996 F.2d 1439, 1441 (2d Cir. 1993) ("[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages against state officials in their official capacities."); *Farid v. Smith*, 850 F.2d 917, 921 (2d Cir. 1988) ("The Eleventh Amendment bars recovery against an employee who is sued in his official capacity, but does not protect him from personal liability if he is sued in his 'individual' or 'personal' capacity.").

[16]      *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989); *accord*, *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.  It is not a suit against the official personally, for the real party in interest is the entity."); *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993) ("To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.").

[17]      *See McGinty v. State of New York*, 251 F.3d 84, 100 (2d Cir. 2001) ("Where it has been successfully demonstrated that a defendant is entitled to sovereign immunity under the Eleventh Amendment, the federal court lacks subject matter jurisdiction over the case, and "the case must be stricken from the docket.") [citation omitted]; *see also* Fed. R. Civ. P. 12(h)(3).

For these reasons, I recommend that, to the extent that Plaintiff's claims are asserted against Defendants in their official capacities (as opposed to being asserted against Defendants in their individual capacities), those claims be dismissed under the Eleventh Amendment.

**B.    Whether Plaintiffs Claims Should Be Dismissed Because, Under the Circumstances, Defendants Are Protected from Liability as a Matter of Law by the Doctrine of Qualified Immunity**

"Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Williams v. Smith*, 781 F.2d 319, 322 (2d Cir. 1986) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 815 [1982]).  As a result, a qualified immunity inquiry in a prisoner civil rights case generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted."  *Sira v. Morton*, 380 F.3d 57, 68-69 (2d Cir. 2004) [citations omitted], *accord*, *Higazy v. Templeton*, 505 F.3d 161, 169, n.8 (2d Cir. 2007) [citations omitted].

In determining the second issue (i.e., whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted), courts in this Circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir. 1991) [citations omitted], *cert. denied*, 503 U.S. 962 (1992).[18]  "As the third part of the test provides, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful."  *Higazy v. Templeton*, 505 F.3d 161, 169-70 (2d Cir. 2007) [citations omitted].[19]  This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).[20]  As the Supreme Court has explained,

> [T]he qualified immunity defense . . . provides ample protection to all but the plainly incompetent or those who knowingly violate the law. . . . Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

---

[18]  *See also Pena v. DePrisco*, 432 F.3d 98, 115 (2d Cir. 2005); *Clue v. Johnson*, 179 F.3d 57, 61 (2d Cir. 1999); *McEvoy v. Spencer,* 124 F.3d 92, 97 (2d Cir. 1997); *Shechter v. Comptroller of City of New York,* 79 F.3d 265, 271 (2d Cir. 1996); *Rodriguez v. Phillips*, 66 F.3d 470, 476 (2d Cir. 1995); *Prue v. City of Syracuse*, 26 F.3d 14, 17-18 (2d Cir. 1994); *Calhoun v. New York State Division of Parole*, 999 F.2d 647, 654 (2d Cir. 1993).

[19]  *See also Anderson v. Creighton*, 483 U.S. 635, 639 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.'") [citation omitted]; *Davis v. Scherer*, 468 U.S. 183, 190 (1984) ("Even defendants who violate [clearly established] constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard."); *Benitez v. Wolff*, 985 F.2d 662, 666 (2d Cir. 1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

[20]  *See also Malsh v. Correctional Officer Austin*, 901 F. Supp. 757, 764 (S.D.N.Y. 1995) [citing cases]; *Ramirez v. Holmes*, 921 F. Supp. 204, 211 (S.D.N.Y. 1996).

*Malley*, 475 U.S. at 341.[21]

Here, as stated above in Part I.B. of this Report-Recommendation, Defendants argue that

Plaintiffs claims should be dismissed because, on the current record, Defendants are protected

from liability as a matter of law by the doctrine of qualified immunity.  (Dkt. No. 39, Part 16, at

19-22 [Defs.' Memo. of Law].)  More specifically, Defendants argue that (1) there is no record

evidence that Defendants committed any Eighth Amendment violation, and (2) even if there is

such record evidence, it was not clearly established, during the time in question, that the DOCS

policy at issue in this action (called the "15 Month Rule")[22] was unconstitutional, nor would a

_____

[21]     *See also Hunter v. Bryant,* 502 U.S. 224, 299 (1991) ("The qualified immunity
standard gives ample room for mistaken judgments by protecting all but the plainly incompetent
or those who knowingly violate the law.") [internal quotation marks and citation omitted].

[22]     The 15 Month Rule, which was embodied in several DOCS "Hepatitis C Primary
Care Practice Guidelines" in effect during the relevant time period, initially provided as follows:

> **CONSIDERATIONS FOR TREATMENT**: Anti-[Hepatitis C Virus]
> therapy should be considered in accordance with the following criteria.
> Completing the Hepatitis C Consult Request E-Form (copy attached)
> will assist the clinician in evaluating the inmate for possible treatment.
> . . . 12. Anticipated incarceration of at least 15 months from the time
> of referral (this includes the 12 month treatment course).  Inmates must
> be placed on Medical Hold for this period.  Inmates who will not
> predictably complete a course of treatment should receive a baseline
> evaluation and be referred to medical follow-up and treatment upon
> release.

(Dkt. No. 39, Part 10, at 4-5 [Ex. G to Defs.' Rule 7.1 Statement, attaching DOCS "Hepatitis C
Primary Care Practice Guidelines" in effect starting on Dec. 13, 2000]; *see also* Dkt. No. 39, Part
10, at 24-25 [Ex. H to Defs.' Rule 7.1 Statement, attaching DOCS "Hepatitis C Primary Care
Practice Guidelines" in effect starting on Feb. 14, 2002, labeling relevant section "CRITERIA
FOR TREATMENT"]; Dkt. No. 39, Part 12, at 5-7 [Ex. J to Defs.' Rule 7.1 Statement, attaching
DOCS "Hepatitis C Primary Care Practice Guidelines" in effect starting on March 10, 2003,
reformatting and adding statements, including statement that "[the E-Form] is used for biopsy
consults, or to obtain treatment approval from Dr. Wright.  You may add comments to the end of
the form."]; Dkt. No. 39, Part 14, at 11-12 [Ex. L to Defs.' Rule 7.1 Statement, attaching DOCS

reasonable officer have known that complying with the 15 Month Rule was unlawful.  (*Id*. at 21-22.)

In response to Defendants' qualified-immunity argument, Plaintiff advances a two-pronged argument.  First, with regard to the issue of whether the Eighth Amendment right in question was *clearly established* between November 2001 and January 2005, Plaintiff argues that, during that time period, Defendants were "put . . . on notice" that their conduct violated the Eighth Amendment by (1) the case of *Johnson v. Wright*, 234 F. Supp.2d 352, 368 (S.D.N.Y. 2002), and (2) "the Court's prior decisions, inmate grievances (including plaintiff's) and inmate lawsuits."  (Dkt. No. 44, Part 7, at 24 [Plf.'s Response Memo. of Law].)  Second, with regard to the issue of whether *a reasonable person would have known* he was violating such a clearly established right, Plaintiff argues that (1) the Second Circuit's decision in *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006), holds that blind adherence to the 15 Month Rule is not reasonable as a matter of law, and (2) a genuine issue of fact exists as to whether Defendant Wright's approval of the 15 Month Rule was reasonable in light of his deposition testimony that he failed for four years to investigate (and/or cause subordinates to investigate) an alternative to the 15 Month Rule.  (*Id*. at 25.)

### 1.      Defendant Buttarazzi

Plaintiff argues that Defendant Buttarazzi's medical care of Plaintiff was deficient (for purposes of the Eighth Amendment) in two ways: (1) he intentionally or recklessly failed to request drug treatment for Plaintiff's Hepatitis C condition for reasons that were not in fact

---

"Hepatitis C Primary Care Practice Guidelines" in effect starting on July 20, 2004, reformatting and adding statements].)

medically supported (e.g., Plaintiff's diabetes and high blood pressure); and (2) he intentionally or recklessly failed to request drug treatment for Plaintiff's Hepatitis C condition because of the 15 Month Rule.  (Dkt. No. 4, at ¶¶ 4, 8-13, 19-29 [Plf.'s Am. Compl.]; Dkt. No. 44, Part 3, ¶¶ 10-14 [Affid. of Scheinbaum]; Dkt. No. 44, Part 7, at 16-17 [Plf.'s Response Memo. of Law].)

### a.      Making of Medically Unsupportable Decision

With regard to the first way in which Defendant Buttarazzi's medical care of Plaintiff was allegedly deficient, I can find no record evidence that Defendant Buttarazzi *intentionally* or *recklessly* failed to request drug treatment for Plaintiff's Hepatitis C condition for reasons (e.g., Plaintiff's diabetes and high blood pressure) that were not in fact medically supported.  Plaintiff tries to show, through the submission of an affidavit of an expert witness (Dr. Richard C. Scheinbaum), that there is no medical support for the opinion that having diabetes and high blood pressure is a reason to forgo or delay drug treatment for Hepatitis C.  For the sake of brevity, I will set aside a fatal flaw that I perceive in the focus of the affidavit of Plaintiff's expert witness.[23]

The more serious problem with Plaintiff's reliance on his expert affidavit is that his reliance ignores the state of mind required for liability to be imposed for deliberate indifference to a serious medical need under the Eighth Amendment.  Specifically, a prisoner must "prove that the charged official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial

---

[23]      Specifically, Plaintiff's expert witness concludes, in pertinent part, only that having high blood pressure does not "preclude [drug] treatment" for Hepatitis C, and that having diabetes does not "preclude [drug] treatment" for Hepatitis C.  (Dkt. No. 44, Part 3, ¶¶ 11, 12 [Affid. of Scheinbaum].)  He does *not* conclude that, where a patient has diabetes and high blood pressure *together*, along with an essentially normal liver function, there is no medical support for an opinion that the potential drawbacks of drug treatment for Hepatitis C (which include complications) outweigh the potential benefits of such drug treatment.

risk of serious harm exists, and he must also draw the inference."  *Johnson v. Wright*, 412 F.3d

398, 403 (2d Cir. 2005) [internal quotation marks and citations].  What this means is that

"deliberate indifference describes a state of mind more blameworthy than negligence."[24]  Rather,

deliberate indifference is a state of mind akin to *criminal recklessness*.[25]

As a result, the issue before the Court is not simply whether Defendant Buttarazzi's

opinion was or was not in fact medically supported.  That would be more akin to the issue in a

---

[24]     *Farmer v. Brennan*, 511 U.S. 825, 835 (1994) ("[D]eliberate indifference [for
purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than
negligence."); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("[A] complaint that a physician has
been negligent in diagnosing or treating a medical condition does not state a valid claim of
medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a
constitutional violation merely because the victim is a prisoner."); *Murphy v. Grabo*, 94-CV-
1684, 1998 WL 166840, at *4 (N.D.N.Y. Apr. 9, 1998) (Pooler, J.) ("Deliberate indifference,
whether evidenced by [prison] medical staff or by [prison] officials who allegedly disregard the
instructions of [prison] medical staff, requires more than negligence.  .  .  .  Disagreement with
prescribed treatment does not rise to the level of a constitutional claim. . . .  Additionally,
negligence by physicians, even amounting to malpractice, does not become a constitutional
violation merely because the plaintiff is an inmate. . . .  Thus, claims of malpractice or
disagreement with treatment are not actionable under section 1983.") [citations omitted].").

[25]     *Farmer v. Brennan,* 511 U.S. 825, 827 (1994) ("[S]ubjective recklessness as used
in the criminal law is a familiar and workable standard that is consistent with the Cruel and
Unusual Punishments Clause as interpreted in our cases, and we adopt it as the test for
"deliberate indifference" under the Eighth Amendment."); *see also Hemmings v. Gorczyk*, 134
F.3d 104, 108 (2d Cir. 1998) ("The required state of mind [for a deliberate indifference claim
under the Eighth Amendment], equivalent to criminal recklessness, is that the official knows of
and disregards an excessive risk to inmate health or safety; the official must both be aware of
facts from which the inference could be drawn that a substantial risk of serious harm exists; and
he must also draw the inference.") [internal quotation marks and citations omitted]; *Hathaway v.
Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) ("The subjective element requires a state of mind that
is the equivalent of criminal recklessness . . . .") [citation omitted]; *accord, Koehl v. Greene*, 06-
CV-0478, 2007 WL 2846905, at *17, n. 98 (N.D.N.Y. Sept. 26, 2007) (Kahn, J.), *Richards v.
Goord*, 04-CV-1433, 2007 WL 201109, at *15, n.124 (N.D.N.Y. Jan. 23, 2007) (Kahn, J.),
*Salaam v. Adams*, 03-CV-0517, 2006 WL 2827687, at *10, n.59 (N.D.N.Y. Sept. 29, 2006)
(Kahn, J.).

negligence or medical malpractice claim.[26]   Rather, the issue before the Court is whether

Defendant Buttarazzi *knew* of, and disregarded, an excessive risk of harm to Plaintiff.[27]

It is clear from the record that, during the time in question (November 2, 2001, to January

10, 2003), Defendant Buttarazzi did not *know* of an excessive risk of harm to Plaintiff due to his

Hepatitis C condition (and/or due to a failure to treat that condition with drugs).  For example, in

his deposition, Defendant Buttarazzi testified, "In my opinion, [drug] treatment [for Plaintiff's

Hepatitis C condition on March 22, 2002] was far from urgently necessary in view of the fact that

his liver function was normal."  (Dkt. No. 39, Part 6, at 27 [Ex. C to Defs.' Rule 7.1 Statement,

attaching Trans. of Buttarazzi Depo.].)  Similarly, he testified that, on April 22, 2002, he did not

believe drug treatment for Plaintiff's Hepatitis C condition was urgently necessary because "[h]is

liver functions were essentially normal."  (*Id*. at 29.)  Moreover, he testified that, between

November 2, 2001, and January 10, 2003, he believed his decision to not request drug treatment

for Hepatitis C was *not* a departure from a good and accepted standard of medical practice

because, given Plaintiff's stable liver function during that time period, he did not consider that

---

[26]     *See*, *e.g.*, *Taylor v. Ortiz*, 05-CV-0574, 2007 U.S. Dist. LEXIS 70142, at *10-11
(D. Colo. Sept. 19, 2007) (dismissing prisoner's Eighth Amendment claim for deliberate
indifference to his Hepatitis C condition based on failure to administer drug treatment, because
plaintiff's claim was based merely on an inadvertent or negligent failure to properly diagnose or
treat a medical condition).

[27]     *Johnson*, 412 F.3d at 403; *see also Gavino v. Papinpus*, 04-CV-5634, 2007 U.S.
Dist. LEXIS 23018, at *14-15 (E.D. Cal. March 16, 2007) (finding that, to prevail on deliberate
indifference claim arising from the failure to treat Hepatitis C, a prisoner had to show not only
that "the course of treatment the doctors chose was medically unacceptable under the
circumstances" but also that "they chose this course in conscious disregard of an excessive risk to
plaintiff's health") [citation omitted].

16

there existed "a significant reason to start [such drug] treatment."  (*Id.* at 39-40.)[28]

Plaintiff argues that Defendant Buttarazzi testified in his deposition that, on November 30, 2001, he knew that Plaintiff's liver function was "abnormal."  (Dkt. No. 44, Part 7, at 16 [Plf.'s Response Memo. of Law].)  However, the only fair and reasonable interpretation of Defendant Buttarazzi's deposition testimony is that (1) on November 30, 2001, he believed Plaintiff's liver function was "abnormal" but was "*improving*," and (2) thereafter (i.e., from January of 2002, to January of 2003), he believed that Plaintiff's liver function was "normal" or "essentially normal."  (Dkt. No. 39, Part 6, at 17-19, 26-32, 34, 39-40 [Ex. C to Defs.' Rule 7.1 Statement, attaching Trans. of Buttarazzi Depo.] [emphasis added].)  This testimony is corroborated by the other record evidence.  (Dkt. No. 39, Part 8 , at 2-25 [Ex. E to Defs.' Rule 7.1 Statement, attaching Plf.'s medical records from November 2, 2001, to January 13, 2003].)

In addition, Plaintiff swears that he and Defendant Buttarazzi had a "poor" relationship. (Dkt. No. 44, Part 6, ¶¶ 11-17 [Plf.'s Affid.].)  For purposes of Defendants' motion, I assume this fact to be true.  However, this fact does not in any way mean that Defendant Buttarazzi somehow (i.e., despite Plaintiff's essentially normal liver function) *knew*, during the time in question, that Plaintiff faced an excessive risk of harm due to his Hepatitis C condition.  Indeed, Plaintiff swears that "Dr. Buttarazzi made statements such as 'There is nothing wrong with you . . . .'" (*Id.* at ¶ 14.)

Even if I were to find that the record somehow contains evidence that Defendant

---

28      *See Brown v. Jone*s, 171 F. App'x 40, 40-41 (9th Cir. 2006) (affirming district court's grant of summary judgment to defendants in prisoner case alleging violation of Eighth Amendment based on failure to administer drug treatment for prisoner's Hepatitis C condition, in part because "[the plaintiff's] relatively normal liver enzyme levels showed the disease was stable and drug treatment was unnecessary").

Buttarazzi knew of such a risk, I would find that the record contains no evidence that he disregarded that risk.  Rather, the record establishes that Defendant Buttarazzi was, during the relevant time period, balancing any need for drug treatment (based on Plaintiff's liver function) against the need to avoid the drug treatment's potential complications (and any impact of those potential complications on Plaintiff's diabetes condition and high blood pressure condition).[29] For example, the record establishes that Defendant Buttarazzi gave Plaintiff rather constant and personal medical care during the time in question–monitoring his Hepatitis C condition (specifically his liver function) as well as his diabetes condition and blood pressure condition.[30] Indeed, to even characterize Defendant Buttarazzi's medical care for Plaintiff during the time in question as a complete denial of "treatment" for his Hepatitis C condition (as the term "treatment" is used in the context of the Eighth Amendment) appears inaccurate.[31]

---

[29]     (Dkt. No. 39, Part 6, at 14-41 [Ex. C to Defs.' Rule 7.1 Statement, attaching Trans. of Buttarazzi Depo.]; Dkt. No. 39, Part 8 , at 2-25 [Ex. E to Defs.' Rule 7.1 Statement, attaching Plf.'s medical records from November 2, 2001, to January 13, 2003].)

[30]     (*Id.*)  *See Trillo v. Grannis*, 06-CV-0075, 2008 U.S. Dist. LEXIS 2428, at *41-42 (E.D. Cal. Jan. 11, 2008) ("[P]laintiff [has not] shown that defendants chose the course of [his Hepatitis C] treatment [which did not involve a full course of drug treatment] in conscious disregard of an excessive risk to his health. . . .  In fact, the volume and content of plaintiff's medical records as well as the frequency of his medical visits contradicts his subjective belief that defendants ignored or failed to respond reasonably to his medical needs.  Plaintiff's medical care [for his Hepatitis C condition] was certainly inefficient at times . . . .  Nonetheless, plaintiff has failed to demonstrate that the defendants named in this action were deliberately indifferent to his medical needs.")

[31]     *See Bender v. Regier*, 385 F.3d 1133, 1137 (8th Cir. 2004) (finding that "[i]t is uncontroverted that [the prison physician] treated [the prisoner's] medical needs including his [Hepatitis C] condition for many months," based on fact that the physician monitored, and ordered testing of, that condition); *Ruiz v. Martin*, 72 F. App'x 271, 276 (6th Cir. 2003) (affirming district court finding that "[the prison physician] treated [the prisoner] for his [H]epatitis C [condition], deeming [the prisoner] a poor candidate for a specific treatment that [the prisoner] had requested"); *Francisco v. Corr. Med. Sys.*, 548 F. Supp.2d 128, 131 (D. Del. 2008) ("[The

Because there is no record evidence of any violation of the Eighth Amendment by Defendant Buttarazzi, his qualified immunity argument succeeds and the Court need not, and I do not, proceed to the second issue involved in a qualified-immunity inquiry (i.e., whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted). *Higazy*, 505 F.3d at 169, n.8; *Sira*, 380 F.3d at 68-69.

### b.     Reliance on 15 Month Rule

With regard to the second way in which Defendant Buttarazzi's medical care of Plaintiff was allegedly deficient, I can find no record evidence that Defendant Buttarazzi decided not to request drug treatment for Plaintiff's Hepatitis C condition because of the 15 Month Rule. Rather, according to the record evidence, Defendant Buttarazzi decided not to request drug treatment for Plaintiff's Hepatitis C condition for reasons having absolutely nothing to do with the 15 Month Rule.  For example, Defendant Buttarazzi testified that he did not request drug treatment for Plaintiff's Hepatitis C condition between November 2, 2001, and January 10, 2003, because (1) in his opinion, "[drug] treatment was far from urgently necessary" in view of the fact

---

prisoner] equates not receiving Interferon/Ribavirin treatment [for his Hepatitis C condition] as 'no treatment.'  However, the record establishes that [the prisoner] was seen on multiple occasions by [the prison] physicians, that he received a liver biopsy, and that his cysts and lumps were examined for any neoplastic disease."); *Loukas v. Mich. Dep't of Corr.*, 07-CV-0142, 2008 U.S. Dist. LEXIS 14724, at *8-9 (W.D. Mich. Feb. 27, 2008) ("[P]laintiff's long-term [Hepatitis C] condition has been continuously monitored.  He has received medical attention and merely disputes the adequacy of the treatment [in that he did not receive drug treatment for the condition]."); *Taylor v. Ortiz*, 05-CV-0574, 2007 U.S. Dist. LEXIS 70142, at *13-14 (D. Colo. Sept. 19, 2007) ("[I]t is clear that Plaintiff is receiving treatment for his [Hepatitis C] condition[], even if it is not at the level that he desires.  He is being monitored and his symptoms are addressed to some extent."); *Calloway v. Gusman*, 05-CV-4003, 2006 U.S. Dist. LEXIS 72077, at *19-22 (E.D. La. Aug. 18, 2006) ("Plaintiff's complaint, as amended by his testimony, shows that he received constitutionally adequate medical care [for his Hepatitis C condition] while incarcerated at OPP" in that "he saw doctors at OPP nine times," "liver function tests were performed repeatedly," and he eventually had a liver biopsy).

that Plaintiff's liver function was either improving or normal, (2) in his opinion, since Plaintiff's

liver function was essentially normal, it was "better [for Plaintiff] to live with [H]epatitis C than

[with] the complications of [drug] treatment thereof," (3) before such drug treatment started, he

wanted (as part of his "personal preference") to stabilize Plaintiff's diabetes condition, (4) before

such drug treatment started, he also wanted to lower Plaintiff's blood pressure, and (5) before he

could request such drug treatment, he had to await the results of a gastrointestinal consultation

and a bioposy.  (Dkt. No. 39, Part 6, at 14-41 [Ex. C to Defs.' Rule 7.1 Statement, attaching

Trans. of Buttarazzi Depo.]; *see also* Dkt. No. 39, Part 8 , at 2-25 [Ex. E to Defs.' Rule 7.1

Statement, attaching Plf.'s medical records from November 2, 2001, to January 13, 2003].)

For each of these reasons, I recommend that the Court dismiss Plaintiff's Eighth

Amendment claim against Defendant Buttarazzi based on the doctrine of qualified immunity.

### 2.        Defendant Bartleson

As he argued with regard to Defendant Buttarazzi's medical care of him, Plaintiff argues

that Defendant Bartleson's medical care of him was deficient (for purposes of the Eighth

Amendment) in two ways: (1) he intentionally or recklessly failed to request drug treatment for

Plaintiff's Hepatitis C condition because of the 15 Month Rule; and (2) he intentionally or

recklessly failed to request drug treatment for Plaintiff's Hepatitis C condition for reasons that

were not in fact medically supported.  (Dkt. No. 4, at 5, 8, 9, 14-16, 19-21, 30-37 [Plf.'s Am.

Compl.]; Dkt. No. 44, Part 3, ¶¶ 10-14 [Affid. of Scheinbaum]; Dkt. No. 44, Part 7, at 14-16

[Plf.'s Response Memo. of Law].)

### a.    Reliance on 15 Month Rule

With regard to the first way in which Defendant Bartleson's medical care of Plaintiff was allegedly deficient, there is at least some record evidence establishing that, after October of 2003, he based his decision, in part, on the 15 Month Rule.  More specifically, in his deposition, Defendant Bartleson testified that (1) from January of 2003 to October of 2003, he did not request that Plaintiff receive Hepatitis C drug treatment for reasons other than the 15 Month Rule, and (2) from October of 2003 to January of 2005, he did not request that Plaintiff receive Hepatitis C drug treatment *partly* because of the 15 Month Rule (and partly because of the modest success rate of such treatment, the adverse effects of such treatment, Plaintiff's age, and his otherwise weakened medical condition).[32]  Granted, the extent to which Defendant Bartleson relied on the 15 Month Rule in caring for Plaintiff appears to have varied (and perhaps increased with time) from October of 2003 to January of 2005.  For example, sometimes Defendant Bartleson testified that, during the referenced time period, he would *not* have requested that

_____

[32]    For example, Defendant Bartleson testified as follows, with regard to his treatment of Plaintiff, which began in January of 2003: (1) first he did not request that Plaintiff receive Hepatitis C drug treatment because Bartleson was waiting for the results of a gastrointestinal consultation, and a "liver profile," and he was "dealing with [Plaintiff's] blood pressure problems"; (2) then he was waiting for surgery to be performed on Plaintiff to diagnose and/or treat his gallbladder disease; (3) then he was waiting for the results of various tests (e.g., x-rays, an ultrasound, and a CAT scan) as well as a nephrology consultation; (4) then he was waiting to treat Plaintiff's "other more urgent[,] pressing needs," which included his "gallbladder disease," kidney "situation," "high blood pressure," and pain in his abdomen and sides (which were exacerbated by his age, and which outweighed the need to give him Hepatitis C drug treatment, which "is only 40 to 50 percent successful and [is] very difficult to go through"); and (5) it was during this last period of time (from about October of 2003, to about January of 2005) that the 15 Month Rule become a *factor* (along with Plaintiff's "poor health" and advanced age) in Bartleson's decision not to request the moderately successful and difficult-to-go-through Hepatitis C drug treatment for Plaintiff.  (Dkt. No. 39, Part 7, at 13-33, 47, 49-50 [Ex. D to Defs.' Rule 7.1 Statement, attaching Trans. of Bartleson Depo.].)

Plaintiff receive Hepatitis C drug treatment even if the 15 Month Rule did not exist.[33]  However, at other times Defendant Bartleson testified that the 15 Month Rule was a factor.[34]  Indeed, at two points Defendant Bartleson indicated that a revision to the 15 Month Rule (making Plaintiff eligible for drug treatment) may have been a *significant* factor in his decision.[35]  Because of the

---

[33]     (Dkt. No. 39, Part 7, at 34-35 ["It would depend on the patient [whether I would choose not to submit a request for Hepatitis C [drug] treatment because the risks associated with that treatment outweighed the chances of the treatment's success]. . . .  And in Mr. Bauman's case, I felt the risk of treatment [was] quite high compared to the chance of benefit."], 49 ["If the policy wasn't in place I wouldn't have recommended him to have [drug] treatment any place, any time considering his renal status.  He was having renal problems, all his pain.  And by the time we get to the hepetitis C causing pain, the chance of success is very low.  And so, you're putting a person through extreme risk of problems with – with the treatment"].)

[34]     (*Id*. at 30-31 ["I don't know [if there were any other reasons that I did not request that Plaintiff receive Hepatitis C drug treatment on October 31, 2003] . . . .  I may have asked him how long do you have to – to be in the prison and he may have told me that his earliest release date was XYZ.  I did talk to him about that sort of thing."], 33 ["You have complicated problems [with Plaintiff's health and age] and then beyond that, there's the issue of the 15 months till release, which was a moving target"], 47 ["If he didn't have the 15 months left in, there was nothing left to be done [in terms of talking about Hepatitis C drug treatment]. . . . [Y]ou have to consider Corrections policies . . ."], 51 ["I didn't have to make [the] decision [of whether or not Plaintiff should have been treated if the 15 Month Rule did not exist].  The policy stated that he, according to the policy, shouldn't be treated"].)  It is worth noting that, similarly, Plaintiff testified that Defendant Bartleson told him (at one or more unidentified times) that, to receive Hepatitis C drug treatment, Plaintiff's release date had to be more than a year away.  (Dkt. No. 39, Part 4, at 32-33 [Ex. A to Defs.' Rule 7.1 Statement, attaching Trans. of Plf.'s Depo., stating that Bartleson told him that, before an inmate could get drug treatment for Hepatitis C, "you had to be one year before your release" from DOCS; Dkt. No. 44, Part 6, ¶ 21 [Plf.'s Response Affid., stating, "Several times Dr. Bartleson told me that I would not be treated for Hepatatis C because the computer said my possible release date was too soon"].)

[35]     (*Id*. at 35-36 ["In my opinion, he [was] a poor candidate for [Hepatitis C drug] treatment and, therefore, I wasn't in a big hurry.  But, again, Mr. Baumann had expressed interest in receiving treatment.  I explained there was risk and he probably would not be able to tolerate [the treatment] and I didn't think it was a good idea.  But once the guidelines were revised [so as to make inmates incarcerated in the New York City area eligible for the treatment, despite the 15 month issue], I contacted Mr. Baumann and had him come down and we treated him even though – Ideally, I didn't think it was going to work from the start and I didn't think it was going to work well for him.  But he wanted it and it was his decision and he had the treatment"], 58 ["I may

light in which the Court must construe the record on Defendants' motion, I resolve these

inconsistencies in Plaintiff's favor, finding that there exists a genuine issue of material fact with

regard to whether or not, after October of 2003, Defendant Bartleson based his decision (to not

request drug treatment for Plaintiff's Hepatitis C condition), in part, on the 15 Month Rule.

However, I am unable to resolve in Plaintiff's favor the second issue involved in a

qualified-immunity inquiry (i.e., whether it would be clear to a reasonable officer that his

conduct was unlawful in the situation confronted). This is because, when Defendant Bartleson

delayed requesting drug treatment for Plaintiff's Hepatitis C condition (between March of 2003,

and October of 2004) the constitutional right that Plaintiff is alleging (concerning enforcement of

the 15 Month Rule) was not *clearly established*, and the scope of Defendant Bartleson's

permissible conduct regarding the 15 Month Rule was not *clearly defined*.

The Southern District of New York's 2002 decision in *Johnson v. Wright*, 234 F. Supp.2d

352 (S.D.N.Y. 2002), did not clearly establish the right alleged for two reasons. First, because

the decision was rendered in the Southern District of New York, it could not, by itself, clearly

establish any principle of law in the Northern District of New York, where Cayuga C.F. is

situated. *Jermosen*, 945 F.2d at 551 ("[B]ecause this decision was rendered in the Southern

District of New York, it could not, by itself, clearly establish a principle of law in the Western

District of New York where Attica is situated."). Second, *Johnson v. Wright* involved a

circumstance in which (1) *every* one of the plaintiff's treating physicians indicated to the

defendants that prescribing a medication for the plaintiff's Hepatitis C condition was the

---

have seen the new guidelines [when I made a determination that Mr. Baumann could be treated
for hepatitis C]"].)

medically appropriate course of action, and (2) the defendants denied the plaintiff that medication

based *solely* on the prison policy in question (which was a substance-abuse policy).  412 F.3d

398, 403-06 (2d Cir. 2005).  I can find no record evidence in this case that either of these

circumstances was present when Defendant Bartleson delayed requesting drug treatment for

Plaintiff's Hepatitis C condition during the time in question (between March of 2003 and October

of 2004).[36]

   Furthermore, the Second Circuit's decision in *Salahuddin v. Goord*, 467 F.3d 263 (2d Cir.

2006), did not clearly establish the right that Plaintiff is alleging (concerning enforcement of the

15 Month Rule) during the time in question.  This is because, even assuming that the Second

Circuit's issuance of its decision in *Salahuddin* clearly established the right Plaintiff alleges, the

Second Circuit did not issue that decision until October 27, 2006 (nearly two years after the last

event alleged in Plaintiff's Amended Complaint, dated January 27, 2005).

   Finally, although Plaintiff (in arguing that the right he alleges was clearly established

---

[36]   Granted, Dr. Holtzapple, a gastroenterologist, recommended in September of 2003 (five months after Defendant Bartleson started treating Plaintiff) that Plaintiff should start receiving medication to treat his Hepatitis C condition.  (Dkt. No. 39, Part 7, at 46, 47 [Ex. D to Defs.' Rule 7.1 Statement, attaching Trans. of Bartleson Depo.].)  However, as Defendant Bartleson explained: "[T]he way specialists [like Dr. Holtzapple] work, they deal with their issue, the one issue, which is the liver.  They're not concerned about all the other issues; the kidney, the hypertension, the this and that.  They're more concerned about [how] we treat the liver.  But they don't assess the total picture and that's what our job is, to determine the whole thing."  (Dkt. No. 39, Part 7, at 47 [Ex. D to Defs.' Rule 7.1 Statement, attaching Trans. of Bartleson Depo.].)  Moreover, Defendant Buttarazzi, one of Plaintiff's other treating physicians had *not* recommended drug treatment for Plaintiff's Hepatitis C condition.  Finally, Defendant Bartleson testified that, after October of 2003, he delayed requesting that Plaintiff receive drug treatment for his Hepatitis C condition for several reasons (e.g., Plaintiff's high blood pressure, gallbladder disease, kidney "situation," abdominal pain, old age, etc.)–only one of which was the 15 Month Rule.  (Dkt. No. 39, Part 7, at 13-33, 47, 49-50 [Ex. D to Defs.' Rule 7.1 Statement, attaching Trans. of Bartleson Depo.].)

during the time in question) did not expressly rely on the Second Circuit's decision in *McKenna v. Wright*, 386 F.3d 432 (2d Cir. 2004), I note that the same problem exists with regard to *McKenna* as exists with regard to *Salahuddin*: even assuming that the Second Circuit's issuance of its decision in *McKenna* clearly established the right Plaintiff alleges, the Second Circuit did not issue its decision in *McKenna* until October 28, 2004.  Furthermore, and more importantly, based on the current record, no reasonable fact-finder could conclude that Defendant Bartleson did anything to impermissibly delay requesting that Plaintiff receive drug treatment for his Hepatitis C condition after October 28, 2004.  *See Young v. Goord*, 01-CV-0626, 2005 U.S. Dist. LEXIS 3641, at *24-25 (E.D.N.Y. March 10, 2005) (25-day delay between date new statute became effective and date DOCS Deputy Commissioner instructed all superintendents to comply with new statute was reasonable, and indeed response was "admirably swift").

This is because the record clearly establishes that Defendant Bartleson began preparing to request drug treatment for Plaintiff's Hepatitis C condition on or before November 2, 2004.[37] Specifically, on November 2, 2004, Defendant Bartleson requested a copy of the September 2003 consultation report by Dr. Holtzapple (the gastroenterologist), recommending that Plaintiff start receiving medication to treat his Hepatitis C condition, because "[Defendant Bartleson] wanted to have [the report] . . . before [Plaintiff] started [drug] treatment."[38]  On November 24, 2004,

---

[37]     (Dkt. No. 39, Part 7, at 57-58 [Ex. D to Defs.' Rule 7.1 Statement, attaching Trans. of Bartleson Depo.].)  Defendant Bartleson testified that he may have begun the process at this time because he had perceived a change in the 15 Month Rule that provided that "people [who] lived in the New York City area would be eligible for [drug] treatment regardless of [the 15 Month Rule]." (*Id*. at 35-36, 58.)

[38]     (Dkt. No. 39, Part 7, at 57-58 [Ex. D to Defs.' Rule 7.1 Statement, attaching Trans. of Bartleson Depo.]; Dkt. No. 39, Part 9, at 44 [Ex. F to Defs.' Rule 7.1 Statement, attaching Plf.'s medical records from Nov. 2, 2004].)

December 14, 2004, January 4, 2005, February 1, 2005, and February 11, 2005, Defendant

Bartleson examined Plaintiff, monitored his blood pressure, and treated his complaints of, *inter*

*alia*, abdominal pain.[39]  Meanwhile, on January 19, 2004, Defendant Bartleson scheduled an

appointment with Defendant Buttarazzi to discuss starting drug treatment for Plaintiff's Hepatitis

C condition in the next two to three weeks.[40]  However, on February 1, 2005, Plaintiff expressed

some uncertainty about whether he wanted to receive drug treatment for his Hepatitis C

condition.[41]  Finally, on February 8, 2005, Plaintiff decided to undergo such drug treatment.[42]  As

a result, on February 10, 2005, Defendant Bartleson requested such treatment by submitting a

form electronically to Defendant Wright, who subsequently approved the request.[43]

---

[39]     (Dkt. No. 39, Part 7, at 58-61 [Ex. D to Defs.' Rule 7.1 Statement, attaching Trans. of Bartleson Depo.]; Dkt. No. 39, Part 9, at 45-51 [Ex. F to Defs.' Rule 7.1 Statement, attaching Plf.'s medical records from referenced dates].)

[40]     (Dkt. No. 39, Part 7, at 60 [Ex. D to Defs.' Rule 7.1 Statement, attaching Trans. of Bartleson Depo.]; Dkt. No. 39, Part 9, at 49 [Ex. F to Defs.' Rule 7.1 Statement, attaching Plf.'s medical records from Jan. 19, 2005].)

[41]     (Dkt. No. 39, Part 7, at 60 [Ex. D to Defs.' Rule 7.1 Statement, attaching Trans. of Bartleson Depo.]; Dkt. No. 39, Part 9, at 49-50 [Ex. F to Defs.' Rule 7.1 Statement, attaching Plf.'s medical records from Feb. 1, 2005].)

[42]     (Dkt. No. 39, Part 7, at 61 [Ex. D to Defs.' Rule 7.1 Statement, attaching Trans. of Bartleson Depo.]; Dkt. No. 39, Part 9, at 50 [Ex. F to Defs.' Rule 7.1 Statement, attaching Plf.'s medical records from Feb. 8, 2005].)

[43]      (Dkt. No. 39, Part 7, at 61 [Ex. D to Defs.' Rule 7.1 Statement, attaching Trans. of Bartleson Depo.]; Dkt. No. 39, Part 9, at 51 [Ex. F to Defs.' Rule 7.1 Statement, attaching Plf.'s medical records from Feb. 10, 2005]; Dkt. No. 39, Part 2, ¶ 16 [Affid. of Wright]; Dkt. No. 39, Part 4, at 30-31 [Trans. of Plf.'s Depo.]; Dkt. No. 44, Part 6, ¶ 23 [Plf.'s Response Affid.]; *see also* Dkt. No. 39, Part 12, at 5-7 [Ex. J to Defs.' Rule 7.1 Statement, attaching DOCS "Hepatitis C Primary Care Practice Guidelines" in effect starting on March 10, 2003, stating, in pertinent part, "[The E-Form] is used for biopsy consults, or to obtain [drug] treatment approval from Dr. Wright."].)

As I stated earlier, I find that, based on this undisputed record evidence, no reasonable

fact-finder could conclude that Defendant Bartleson did anything to impermissibly delay (i.e., to

delay in reliance on the 15 Month Rule) requesting that Plaintiff receive drug treatment for his

Hepatitis C condition after October 28, 2004.

### b.      Making of Medically Unsupportable Decision

With regard to the second way in which Defendant Bartleson's medical care of Plaintiff

was allegedly deficient, I can find no record evidence that Defendant Bartleson decided to delay

requesting drug treatment for Plaintiff's Hepatitis C condition for reasons that were *wholly*

without medical support.  Much of the reasoning I employ to make this finding is identical to the

reasoning I employ to make the finding stated above in Part III.B.1.a. of this Report-

Recommendation.

Plaintiff tries to show, through the submission of the affidavit of his expert witness, that

there is no medical support for the opinion that having a condition such as diabetes or high blood

pressure is a reason to forgo or delay drug treatment for Hepatitis C.  (Dkt. No. 44, Part 7, at 14-

16 [Plf.'s Response Memo. of Law]; Dkt. No. 44, Part 3, ¶¶ 10-14 [Affid. of Scheinbaum].)

As an initial matter, I note that, according to the undisputed record evidence, one of the

several reasons that Defendant Bartleson delayed requesting drug treatment for Plaintiff's

Hepatitis C condition was Plaintiff's age, because of its potential for "mak[ing] it less likely

[drug] treatment would be successful," and for exacerbating the "adverse [side] effects of [drug]

treatment."  (Dkt. No. 39, Part 7, at 33-34, 49-50, 61-62 [Ex. D to Defs.' Rule 7.1 Statement,

attaching Trans. of Bartleson Depo.].)  Plaintiff was born on April 2, 1955.  (Dkt. No. 39, Part 4,

at 4 [Trans. of Plf.'s Depo.]; Dkt. No. 39, Part 9, at 8 [Ex. F to Defs.' Rule 7.1 Statement,

attaching Plf.'s medical record from March 5, 2003].)  As a result, Plaintiff was between 47 and

49 years of age during the time in question (i.e., between March 5, 2003, and January 27, 2005).

(*Id*.)  Plaintiff has adduced no evidence that Defendant Bartleson's reliance on Plaintiff's age was

not medically supported.  Plaintiff's expert witness did not so swear in his affidavit.  (*See

generally* Dkt. No. 44, Part 3, ¶¶ 10-14 [Affid. of Scheinbaum, opining on whether a patient's

having hypertension, diabetes, renal disease, or gall bladder disease is a medically supportable

reason for delaying administering drug treatment for Hepatitis C].)  The National Institutes of

Health "Consensus Development Statement," which Plaintiff's expert witness attached as an

exhibit to his affidavit, does not so state.[44]

        In any event, the more serious problem with Plaintiff's reliance on his expert affidavit is

that his reliance ignores the state of mind required for liability to be imposed for deliberate

indifference to a serious medical need under the Eighth Amendment.  Applying this state-of-

mind requirement, the issue before the Court is whether Defendant Bartleson *knew* of, and

disregarded, an excessive risk of harm to Plaintiff.  It is clear from the record that, during the

---

[44]      To the contrary, the Statement suggests that an age of over 60 may actually be a
medically supported factor to consider when deciding whether or not Hepatitis C drug treatment
is appropriate for a patient.  (Dkt. No. 44, Part 5, at 9 [Ex. B to Affid. of Scheinbaum, attaching
"National Institutes of Health Consensus Development Statement: Management of Hepatitis C,"
dated March 24-26, 1997, stating, in pertinent part, "[G]iven the current status of therapies for
hepatitis C, [drug] treatment is clearly recommended only in a selected group of patients. . . .
[F]irm recommendations on treatment with interferon cannot be made for patients . . . over age
60 because of incomplete data."].)  *See also Akers v. Oriz*, 01-CV-2513, 2004 U.S. Dist. LEXIS
30492, at *2-3, 8-9 (D. Colo. Aug. 13, 2004) ("I cannot second-guess the [Colorado Department
of Corrections'] judgment based on medical or other grounds, for the [65 year] age limit [for drug
treatment for Hepatitis C]."); *Taylor v. Ortiz*, 05-CV-0574, 2007 U.S. Dist. LEXIS 70142, at *3,
12-15, 20 (D. Colo. Sept. 19, 2007) (dismissing prisoner's Eighth Amendment claim against
prison physicians who denied him drug treatment for his Hepatitis C condition because his age,
66, was passed the age limit set by the Colorado Department of Corrections, age 65, for such
treatment).

time in question, Defendant Bartleson did not *know* of an excessive risk of harm to Plaintiff due to his Hepatitis C condition (and/or due to a failure to treat that condition with drugs).

For example, in his deposition, Defendant Bartleson testified that he delayed requesting that Plaintiff's Hepatitis C condition be treated with drugs, in part because *he believed* that Plaintiff "had some other[,] more urgent[,] pressing needs"–"issues that . . . were of [a] higher priority." (Dkt. No. 39, Part 7, at 30, 33 [Ex. D to Defs.' Rule 7.1 Statement, attaching Trans. of Bartleson Depo.].) Defendant Bartleson testified that, in his opinion, these other issues included the following: (1) Plaintiff's "renal situation"; (2) the fact that he "had just completed his surgery not that long [before]," and "a person needs to be in pretty good health to tolerate hepatitis C [drug] treatment"; (3) his abdominal pain and his "continued right upper quadrant and flank pain after having the procedures done"; (4) the fact that "he was being evaluated to see if the pain was coming from his liver or kidney"; (5) his high blood pressure; (6) his gallbladder disease; (7) his "older age" and the fact that "the rate of success [of the drug treatment] goes down the older the person gets"; (8) "the type of hepatitis that he [had]"; and (9) the fact that drug treatment for Hepatitis C "is a treatment which is . . . only 40 to 50 percent successful and [which is] very difficult to go through." (Dkt. No. 39, Part 7, at 30, 32-34 [Ex. D to Defs.' Rule 7.1 Statement, attaching Trans. of Bartleson Depo.].) Finally, Defendant Bartleson testified that "it would make it near impossible . . . for [Plaintiff] to deal with all those problems [if he was receiving the drug treatment for Hepatitis C]," and that "[i]n my opinion he [was] a poor candidate for treatment and, therefore, I wasn't in a big hurry." (*Id*. at 35.)

As explained above in Part Part III.B.1.a. of this Report-Recommendation, whether or not Defendant Bartleson's medical opinion was ultimately in error is not the critical issue in the state-

of-mind analysis.  The critical issue is whether, at the time in question, he *knew* of, and disregarded, an excessive risk of harm to Plaintiff due to his Hepatitis C condition (or a failure to treat that condition with drugs).  For the reasons stated above, I find that Defendant Bartleson did not know of such an excessive risk of harm to Plaintiff.  Indeed, I find that the only reasonable interpretation of Defendant Bartleson's deposition testimony is that, during the time in question, Defendant Bartleson *believed* that it was *the drug treatment itself* that would have posed an excessive risk of harm to Plaintiff.  (*See* Dkt. No. 39, Part 7, at 32-35 [Ex. D to Defs.' Rule 7.1 Statement, attaching Trans. of Bartleson Depo., containing testimony that drug treatment for Hepatitis C is "very difficult to go through," "very difficult for people who have no other health problems," "is very risky, full of adverse side effects," and "would make it near impossible . . . [for Plaintiff] to deal with all [of his other health] problems"].)

Even if I were to find that the record somehow contains evidence that Defendant Bartleson knew of such a risk, I would find that the record contains no evidence that he *disregarded* that risk.  Rather, the record establishes that Defendant Bartleson was, during the relevant time period, balancing any need for drug treatment against the need to avoid the drug treatment's potential complications.  (*See generally* Dkt. No. 39, Part 7 [Ex. D to Defs.' Rule 7.1 Statement, attaching Trans. of Bartleson Depo.]; Dkt. No. 39, Part 9 [Ex. F to Defs.' Rule 7.1 Statement, attaching Plf.'s medical records].)

Because there is no record evidence of any violation of the Eighth Amendment by Defendant Bartleson, his qualified immunity argument succeeds and the Court need not, and I do not, proceed to the second issue involved in a qualified-immunity inquiry (i.e., whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted).

*Higazy*, 505 F.3d at 169, n.8; *Sira*, 380 F.3d at 68-69.

For each of these reasons, I recommend that the Court dismiss Plaintiff's Eighth Amendment claim against Defendant Bartleson based on the doctrine of qualified immunity.

### 3.   Defendant Wright

As stated above in Part I.A. of this Report-Recommendation, Plaintiff's Amended Complaint alleges that Defendant Wright was deliberately indifferent to Plaintiff's Hepatitis C condition in two ways: (1) Defendant Wright created, and/or allowed the continuance of, the 15 Month Rule upon which Defendants Buttarazzi and Bartleson relied when they refused to treat Plaintiff's Hepatitis C condition for reasons other than medical necessity; and/or (2) he failed to cause Plaintiff to receive Hepatitis C drug treatment despite receiving at least one written complaint by Plaintiff that he was not receiving the Hepatitis C drug treatment he needed.  (Dkt. No. 4, ¶¶ 6, 8, 9, 17, 18-21, 38-48 [Plf.'s Am. Compl.].)

However, after conducting discovery, and facing Defendants' lack-of-personal-involvement argument (*see* Dkt. No. 39, Part 16, at 6-8 [Defs.' Memo. of Law]), Plaintiff has effectively abandoned the latter allegation.  Even if he has not intended to abandon that allegation, I would find that no record evidence exists in support of it.  I so conclude because, in his response to Defendants' lack-of-personal-involvement argument, Plaintiff does not argue (or point to any record evidence) that Defendant Wright failed to cause Plaintiff to receive Hepatitis C treatment despite receiving at least one written complaint by Plaintiff that he was not receiving the Hepatitis C treatment he needed.  (Dkt. No. 44, Part 7, at 17-24 [Plf.'s Response Memo. of Law].)  Rather, Plaintiff argues that Defendant Wright was personally involved in the constitutional violations alleged for three reasons: (1) in his deposition, Defendant Wright

testified that he personally approved the 15 Month Rule; (2) Defendant Wright had prior notice

of "incidents" occurring as a result of the 15 Month Rule; and (3) in his deposition, Defendant

Wright testified that he knew that DOCS' prison medical staff needed to make a determination of

an inmate's "anticipated incarceration" under the 15 Month Rule, but he had no idea how the

medical staff made such a determination (other than to possibly refer the decision to him if they

were uncertain).  (*Id.*)

Simply stated, then, Plaintiff's claim against Defendant Wright depends on the 15 Month

Rule's unconstitutionality (either facial or as implemented by DOCS correctional facility

physicians and other staff).  The problem with this claim is two fold.  First, as stated above in

Parts III.B.2.a. of this Report-Recommendation, the earliest that the constitutional right alleged

by Plaintiff became clearly established in the Northern District of New York was on October 28,

2004, when the Second Circuit issued its decision in *McKenna v. Wright*, 386 F.3d 432 (2d Cir.

2004).[45]

Second, there is no evidence in the record that either Defendant Buttarazzi or Defendant

Bartleson relied on the 15 Month Rule after October 28, 2004, to delay making a request that

Plaintiff receive drug treatment for Hepatitis C.  Rather, only Defendant Bartleson was treating

Plaintiff at that time; and the record evidence rather clearly establishes that, on November 2,

2004, Defendant Bartleson was engaged in the process of preparing to request that Plaintiff

receive such drug treatment, while simultaneously attempting to gain more control of various of

his other health conditions.  *See*, *supra*, Part III.B.2.a. of this Report-Recommendation.  Simply

---

[45]     For the sake of much-needed brevity, I assume, for purposes of this Report-
Recommendation, that the Second Circuit's issuance of its decision in *McKenna* clearly
established the right Plaintiff alleges.

stated, by the end of October of 2004 and the beginning of November of 2004, the 15 Month

Rule was not being used by Defendant Bartleson to delay Plaintiff's drug treatment for Hepatitis

C.  Furthermore, on February 10, 2005, when Defendant Wright first learned of Plaintiff's request

for drug treatment for Hepatitis C, Defendant Wright *granted* that request.  *See*, *supra*, note 43 of

this Report-Recommendation.  As a result, based on the current record, correctional officials of

reasonable competence in Defendant Wright's position could have concluded that they were not

violating any of Plaintiff's clearly established constitutional rights.

For these reasons, I recommend that the Court dismiss Plaintiff's Eighth Amendment

claim against Defendant Wright based on the doctrine of qualified immunity.

> **C.     Whether, in the Alternative, Plaintiff's Claim Against Defendant Wright
> Should Be Dismissed Because Plaintiff Has Failed to Adduce any Record
> Evidence Establishing that Defendant Wright Was Personally Involved in the
> Constitutional Violations Alleged**

Because I have already found that adequate grounds exists upon which to base a

recommendation that the Court dismiss Plaintiff's claim against Defendant Wright, I need not

discuss Plaintiff's alternative argument in favor of dismissal of that claim, namely, their argument

that no record evidence exists that Defendant Wright was personally involved in the

constitutional violations alleged.  However, in the interest of thoroughness, and because my

conclusion above in Part III.B.3. of this Report-Recommendation involves a personal-

involvement analysis, I will discuss Defendants' personal-involvement argument.

 In making their argument that no record evidence exists establishing that Defendant

Wright was personally involved in the constitutional violations alleged, Defendants argue that (1)

Defendant Wright did not make any treatment decisions regarding Plaintiff's Hepatitis C drug

33

treatment, (2) such decisions were made by Plaintiff's treating physicians (i.e., Defendants Buttarazzi and Bartleson) based on their knowledge of Plaintiff's medical history, and (3) Defendant Wright *approved* but did not *create* the 15 Month Rule.  (Dkt. No. 39, Part 16, at 7-8 [Defs.' Memo. of Law].)  Rather, Defendants argue, the first time that Defendant Wright became personally involved in the constitutional violations alleged was in February of 2005, when he received Plaintiff's Hepatitis C drug treatment approval forms.  (*Id*. at 6, 8.)

As stated above in Part III.B.3. of this Report-Recommendation, Plaintiff responds to Defendants' personal-involvement argument by arguing that the following record evidence exists establishing that Defendant Wright was personally involved in the constitutional violations alleged: (1) Defendant Wright's deposition transcript containing his testimony that he personally approved the offending policy in question (called "the 15 Month Rule"); (2) the fact that Defendant Wright had prior notice of "incidents" occurring as a result of the 15 Month Rule; and (3) Defendant Wright's deposition transcript containing his testimony that he knew that DOCS' prison medical staff needed to make a determination of an inmate's "anticipated incarceration" under the 15 Month Rule, but he had no idea how the medical staff made such a determination (other than to possibly refer the decision to him if they were uncertain).  (Dkt. No. 44, Part 7, at 17-24 [Plf.'s Response Memo. of Law].)

In reply to Plaintiff's response, Defendants argue that whether or not Defendant Wright's approval of the 15 Month Rule somehow caused Plaintiff to not start receiving Hepatitis C drug treatment until March of 2005 is "entirely irrelevant" because the undisputed record evidence establishes that, when Plaintiff started that treatment in March of 2005, it became clear that he could not tolerate that treatment.  (Dkt. No. 45, at 1 [Defs.' Reply Letter-Brief].)

"'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 [2d Cir. 1991]).[46]  In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant.[47]  If the defendant is a supervisory official, such as a DOCS Commissioner or Deputy Commissioner, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior*) is insufficient to show his or her personal involvement in that unlawful conduct.[48]  In other words, supervisory officials may not be held liable merely because they held a position of authority.[49]  Rather, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the alleged constitutional violation, (2) failed to remedy the violation after being informed of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing or supervising subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that

---

[46]     *Accord*, *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087 (1978); *Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987).

[47]     *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

[48]     *Polk County v. Dodson*, 454 U.S. 312, 325 (1981); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501; *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985).

[49]     *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996).

constitutional violations were occurring.[50]

### 1.   Direct Participation in Violation

Taking these five means of personal involvement in order of increasing significance, I find no record evidence that Defendant Wright *directly participated* in the constitutional violation alleged, for example, the decision to forgo or delay Plaintiff's receipt of drug treatment for his Hepatitis C condition.  Rather, the undisputed record evidence is that decision was made by Defendants Buttarazzi and/or Bartleson.  To say that Defendant Wright *directly participated* in that decision by "personally approving" the 15 Month Rule (upon which Defendants Buttarazzi and/or Bartleson relied in making that decision) would be to so stretch the meaning of *direct participation* as to render meaningless the distinction between *direct participation* and *policy creation/continuation* in the five-pronged personal-involvement standard (stated above in Part III.C. of this Report-Recommendation).

### 2.   Failure to Remedy After Notice of Violation

I also find no record evidence that Defendant Wright *failed to remedy that violation after learning of it through a report or appeal*.  Although Plaintiff, in his Amended Complaint, alleges that Defendant Wright "received and acted upon at least one [written] complaint" by Plaintiff that he was not receiving the Hepatitis C treatment he needed (Dkt. No. 1, at ¶¶ 17-18, 44 [Plf.'s Am. Compl.]), I can find no record evidence of when that complaint was sent or received, what it said,

---

[50]     *Iqbal v. Hasty*, 490 F.3d 143, 152 (2d Cir. 2007) (setting forth five prongs); *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (adding fifth prong); *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (adding fifth prong); *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986) (setting forth four prongs).

whether Defendant Wright read it, or how he responded to it.[51]

Indeed, I can find no record evidence that Defendant Wright had even heard of Plaintiff before February 10, 2005 (when Defendant Bartleson electronically submitted to Wright's office a request that Plaintiff receive Hepatatis C drug treatment).  (Dkt. No. 39, Part 2, ¶¶ 2, 16 [Affid. of Wright]; *see generally* Dkt. No. 39, Part 5 [Ex. B to Defs.' Rule 7.1 Statement, attaching Trans. of Wright Depo.].)

To the extent that Plaintiff is referring to the (asserted) fact that Defendant Wright had prior notice of "incidents" occurring as a result of the 15 Month Rule, or of the need for doctors (in general) implementing the 15 Month Rule to know how to determine an inmate's "anticipated incarceration," such notice is not knowledge of the constitutional violation alleged in this action (i.e., that *Plaintiff's* Eighth Amendment rights were being violated through the reckless decision *by Defendants Buttarazzi and/or Bartleson* to forgo or delay his receipt of treatment for his Hepatitis C condition).[52]

Finally, to the extent that Plaintiff is referring to Defendant Wright's receipt of Defendant Bartleson's request to treat Plaintiff's Hepatatis C condition with combined drug therapy, the record evidence indicates that (1) Defendant Bartelson's request was not submitted to Defendant Wright's office until February 10, 2005, and (2) in any event, Defendant Wright *approved* that

---

[51]     (*See*, *e.g.*, Dkt. No. 39, Part 4 [Trans. of Plf.'s Depo., not providing any details about the alleged written complaint "received and acted upon" by Wright], *accord*, Dkt. No. 44, Part 6, ¶¶ 1-24 [Plf.'s Response Affid.]; Dkt. No. 44, Part 7, at 2-9, 17-24 [Plf.'s Response Memo. of Law, not providing a record cite to any such written complaint]; Dkt. No. 39, Part 5 [Ex. B to Defs.' Rule 7.1 Statement, attaching Trans. of Wright's Depo., not indicating that he received and/or read any such written complaint from Plaintiff], *accord*, Dkt. No. 39, Part 2, ¶ 16 [Affid. of Wright].)

[52]     It should be remembered that this is *not* a class action.

request.  (Dkt. No. 39, Part 2, ¶ 16 [Affid. of Wright].)  It is worth noting that it is difficult to imagine how Plaintiff could be referring to this event, since the event occurred approximately two weeks *after* the occurrence of the last event alleged in Plaintiff's Amended Complaint (which is dated January 27, 2005).  (Dkt. No. 4 [Plf.'s Am. Compl.].)

### 3.     Deliberate Indifference to Rights of Inmates

I also find no record evidence that Defendant Wright exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that constitutional violations were occurring.  As stated above, there is no record evidence that Defendant Wright had even heard of Plaintiff before February 10, 2005, when Defendant Bartleson electronically submitted to Defendant Wright's office a request that Plaintiff receive Hepatatis C drug treatment.  *See*, *supra*, Part III.B.2. of this Report-Recommendation.

Furthermore, there is no record evidence that Defendant Wright had, before February of 2005, obtained information indicating that the constitutional rights of *other inmates* were being violated due to the 15 Month Rule, or its application.  It appears that Plaintiff argues that this information came from (1) the fact that (incorrectly) checking an inmate's *earliest* release date on a prison computer was just "the way it was done" in DOCS, according to Defendant Bartleson's deposition testimony, and (2) the fact that prior "incidents" had occurred as a result of the 15 Month Rule.  (Dkt. No. 44, Part 7, at 20 [Plf.'s Response Memo. of Law].)  Specifically, Plaintiff would argue that these "incidents" were the events giving rise to two cases: (1) *McKenna v. Wright*, 386 F.3d 432 (2d Cir. 2004); and (2) *Salahuddin v. Goord*, 467 F.3d 263 (2d Cir. 2006). (*Id.*)

However, in his deposition, Defendant Bartleson did not testify that checking an inmate's

*earliest* release date on a prison computer was just "the way it was done" in *all* DOCS

correctional facilities, only at Cayuga C.F. (Dkt. No. 39, Part 7, at 37 [Ex. D to Defs.' Rule 7.1

Statement, attaching Trans. of Bartleson Depo., stating, "That was – The way it was done *here*

. . . ."] [emphasis added].) Indeed, it is unclear how Bartleson would even have known how

things were done at *all* DOCS correctional facilities, since he indicated in his deposition that the

only correctional facilities at which he had been employed by DOCS were Cayuga C.F. and Mid-

State C.F. (*Id*. at 6-8; *see also id.* at 70 [admitting that he did not know if a new medical security

policy was extended to all DOCS correctional facilities or just in Cayuga C.F.].)

 Furthermore, the "incidents" giving rise to the legal actions of *McKenna v. Wright* and

*Salahuddin v. Goord* were not sufficient to inform Defendant Wright, between November of

2001 and January of 2005, of the fact that medical staff employed by DOCS were

unconstitutionally determining inmates' "anticipated incarcerations" (for purposes of the 15

Month Rule).

 In *McKenna*, the prison official in question, a physician named Dr. Frank Lancellotti,

based his "anticipated incarceration" determination on the fact that the plaintiff had a Parole

Board appearance scheduled in just under one year. *McKenna*, 386 F.3d at 434; *see also*

*McKenna v. Wright*, 01-CV-6571, 2004 WL 102752, at *1 (S.D.N.Y. Jan. 21, 2004). I do not

understand that basis of determination to be the same as the basis of determination used by

Defendant Bartleson (which was simply to check a prison computer to determine Plaintiff's

earliest release date). In any event, Defendant Wright did not obtain notice that Dr. Lancellotti's

basis of determination was unconstitutional when the Second Circuit issued its decision in

*McKenna* on October 18, 2004. In their decision, the Second Circuit merely affirmed a ruling by

39

the Southern District of New York that the plaintiff had adequately pled a claim that, *inter alia*,

Dr. Lancellotii had not acted in an objectively reasonable manner (for purposes of overcoming

the defendants qualified immunity defense, asserted under Fed. R. Civ. P. 12[b][6]).  *See*

*McKenna*, 386 F.3d at 436-37; *McKenna*, 2004 WL 102752, at *7-8.  Even if one were to treat

such rulings by the Second Circuit and Southern District as notice that Dr. Lancellotti's basis of

determination was unconstitutional, notice of an unconstitutional act by one doctor in one

correctional facility (specifically, Woodbourne C.F.) is not notice that multiple constitutional

violations were occurring across DOCS.  Finally, Defendant Wright did not testify in his

deposition that he had any knowledge of this lawsuit.  (*See generally* Dkt. No. 39, Part 5 [Ex. B

to Defs.' Rule 7.1 Statement, attaching Trans. of Wright Depo.].)

Similar problems exist with regard to the case of *Salahuddin v. Goord*.  In that case, the

Second Circuit merely found that a question of fact existed as to whether it was reasonable for a

prison official (a physician named Dr. Piazza) to postpone the plaintiff's Hepatitis C drug

treatment for five months because the plaintiff's parole-eligibility date was not more than twelve

months away.  *Salahuddin*, 467 F.3d at 271, 281.  Even if one were to treat this ruling by the

Second Circuit as notice that the basis of Dr. Piazza's "anticipated incarceration" determination

was unconstitutional, that notice did not come until the Second Circuit issued its decision on

October 27, 2006 (more than a year and a half after the last event alleged in Plaintiff's Amended

Complaint).  Before that decision had been issued, the controlling ruling in that case–issued by

Judge Charles L. Brieant (on April 2, 2004)– was that *no* question of fact existed.  *Salahuddin*,

467 F.3d at 269; *see also Salahuddin v. Goord*, 02-CV-5253, Memorandum-Decision and Order

(S.D.N.Y. filed Apr. 2, 2004) (Brieant, J.).  As a result, even if I were to assume that Defendant

Wright had knowledge of that lawsuit (a fact of which there is no evidence in the current record),[53] I would find that his understanding would have been that Dr. Piazza's "anticipated incarceration" determination was constitutionally permissible.

###### 4.      Grossly Negligent Management

I also find no record evidence that Defendant Wright had been grossly negligent in managing or supervising any subordinates, including Defendants Buttarazzi or Bartleson. Plaintiff argues that Defendant Wright was grossly negligent because (1) he knew that DOCS' prison medical staff needed to make a determination of an inmate's "anticipated incarceration" under the 15 Month Rule, but (2) he had no idea how the medical staff made such a determination, other than to possibly refer the decision to him if they were uncertain.  (Dkt. No. 44, Part 7, at 20-21 [Plf.'s Response Memo. of Law].)  In support of his argument, he cites the deposition testimony of Defendant Wright.  (*Id*.)

The problem with Plaintiff's syllogism is that the second part of the syllogism should not be that Defendant Wright *had no idea* how the medical staff made such a determination, but that Defendant Wright *knew* that a significant number of the medical staff employed by DOCS *needed training or guidance* in order to make a determination of an inmate's "anticipated incarceration" under the 15 Month Rule (and that he nonetheless failure to provide that training or guidance).  Without that crucial evidence, all Plaintiff has provided (at most) is evidence of ordinary negligence, not *gross* negligence.

I can find no evidence in the record that Defendant Wright *knew* that a significant number

---

[53]      (*See generally* Dkt. No. 39, Part 5 [Ex. B to Defs.' Rule 7.1 Statement, attaching Trans. of Wright Depo.].)

of the medical staff employed by DOCS *needed training or guidance* in order to make a

determination of an inmate's "anticipated incarceration" under the 15 Month Rule.  It appears that

Plaintiff would argue that this knowledge came from the same two sources described above in

Part III.B.3. of this Report-Recommendation: (1) the fact that (incorrectly) checking an inmate's

*earliest* release date on a prison computer was just "the way it was done" in DOCS, according to

Defendant Bartleson's deposition testimony); and (2) the fact that prior "incidents" had occurred

as a result of the 15 Month Rule.  (Dkt. No. 44, Part 7, at 20 [Plf.'s Response Memo. of Law].)

Specifically, Plaintiff would argue that these "incidents" were the events giving rise to two cases:

(1) *McKenna v. Wright*, 386 F.3d 432 (2d Cir. 2004); and (2) *Salahuddin v. Goord*, 467 F.3d 263

(2d Cir. 2006).  (*Id*.)

For the sake of brevity, I will not repeat the fatal problems with this "evidence."  I will

only refer the reader to Parts III.C.2. and III.C.3. of this Report-Recommendation (for a statement

of those problems), and add two points.  First, starting on March 10, 2003 (shortly after

Defendant Bartleson became Plaintiff's treating physician), the 15 Month Rule was revised so as

to, *inter alia*, enable physicians, when completing the electronic form used to obtain drug

treatment approval from Defendant Wright, to add comments to the end of the form.  (Dkt. No.

39, Part 12, at 5-7 [Ex. J to Defs.' Rule 7.1 Statement, attaching DOCS "Hepatitis C Primary

Care Practice Guidelines" in effect starting on March 10, 2003, adding statement, "[The E-Form]

is used for biopsy consults, or to obtain treatment approval from Dr. Wright.  You may add

comments to the end of the form."].)

Second, Defendant Wright testified in his deposition that he *subjectively believed* that

medical staff referred questions to superiors (usually directly to him) if they did not know how to

42

determine an inmate's "anticipated incarceration" for purposes of the 15 Month Rule.

Specifically, he testified as follows:

> [I]f it's clear to the facility that the person would not be [released within twelve months], then that [determination] would be appropriate for them to make.  If it was unclear whether the person would be or wouldn't [be], in most cases, to my knowledge, those were referred to me, and I would do my best efforts to [make that determination].

(Dkt. No. 39, Part 5, at 29-30 [Ex. B to Defs.' Rule 7.1 Statement, attaching Trans. of Wright Depo.].)

### 5.      Policy Creation or Continuation

My finding with regard to the last means of personal involvement (i.e., whether any record evidence exists that Defendant Wright created, or allowed to continue, a policy or custom under which the alleged Eighth Amendment violation occurred) requires more discussion. Defendant Wright testified in his deposition that he personally approved the policy in question, the 15 Month Rule.  (Dkt. No. 39, Part 5, at 15-18 [Ex. B to Defs.' Rule 7.1 Statement, attaching Trans. of Wright Depo.]; *see also* Dkt. No. 39, Part 2, ¶ 11 [Affid. of Wright].)  However, this fact brings Defendant Wright only half the way into involvement in the alleged constitutional violation.  There must still exist record evidence that the constitutional violation *occurred* and that it did so *under the 15 Month Rule*.

With regard to any constitutional violation committed by Defendant *Buttarazzi*, even if I were to assume for the sake of argument that Defendant Buttarazzi committed a constitutional violation, I can find no record evidence that such a violation occurred *under the 15 Month Rule*. To the contrary, Defendant Buttarazzi testified that he did not treat Plaintiff's Hepatitis C

condition for reasons other than the 15 Month Rule.[54]

With regard to any constitutional violation committed by Defendant *Bartleson*, the issue of whether any such violation occurred under the 15 Month Rule is more complicated.  In his deposition, Defendant Bartleson testified that (1) from January of 2003 to October of 2003, he did not request that Plaintiff receive Hepatitis C drug treatment for reasons other than the 15 Month Rule, and (2) from October of 2003 through October of 2004, he did not request that Plaintiff receive Hepatitis C drug treatment *partly* because of the 15 Month Rule (and partly because of the modest success rate of such treatment, the adverse effects of such treatment, Plaintiff's age, and his otherwise weakened medical condition).[55]

---

[54]   Specifically, Defendant Buttarazzi testified that he did not request drug treatment for Plaintiff's Hepatitis C condition between November 2, 2001, and January 10, 2003, because (1) in his opinion, "treatment was far from urgently necessary" in view of the fact that Plaintiff's liver function was either improving or normal, (2) in his opinion, since Plaintiff had a normal liver function, it was "better [for Plaintiff] to live with [H]epatitis c than [with] the complications of treatment thereof," (3) before such treatment started, he wanted (as part of his "personal preference") to stabilize Plaintiff's diabetes condition, (4) before such treatment started, he wanted to lower Plaintiff's blood pressure, and (5) before such treatment started, he had to await the results of a gastrointestinal consultation and a biopsy.  (Dkt. No. 39, Part 6, at 14-41 [Ex. C to Defs.' Rule 7.1 Statement, attaching Trans. of Buttarazzi Depo.].)

[55]   For example, Defendant Bartleson testified as follows, with regard to his treatment of Plaintiff, which began in January of 2003: (1) first he did not request that Plaintiff receive Hepatitis C drug treatment because Bartleson was waiting for the results of a gastrointestinal consultation, and a "liver profile," and he was "dealing with [Plaintiff's] blood pressure problems"; (2) then he was waiting for surgery to be performed on Plaintiff to diagnose and/or treat his gallbladder disease; (3) then he was waiting for the results of various tests (e.g., x-rays, an ultrasound, and a CAT scan) as well as a nephrology consultation; (4) then he was waiting to treat Plaintiff's "other more urgent[,] pressing needs," which included his "gallbladder disease," kidney "situation," "high blood pressure," and pain in his abdomen and sides (which were exacerbated by his age, and which outweighed the need to give him Hepatitis C drug treatment, which "is only 40 to 50 percent successful and [is] very difficult to go through"); and (5) it was during this last period of time (from about October of 2003, to about January of 2005) that the 15 Month Rule become a *factor* (along with Plaintiff's "poor health" and advanced age) in Bartleson's decision not to request the moderately successful and difficult-to-go-through

The extent to which Defendant Bartleson relied on the 15 Month Rule in caring for Plaintiff appears to have varied from October of 2003 through October of 2004.  However, the inconsistencies in the extent to which Defendant Bartleson relied on the 15 Month Rule are not material.  What is material is the undisputed fact that the 15 Month Rule was not the *sole* reason that Defendant Bartleson did not recommend Plaintiff for Hepatitis C drug treatment from October of 2003 through October of 2004.[56]

The reason this fact is material is that, in this personal-involvement analysis conducted on Defendants' motion for summary judgment, we face the issue of whether any Eighth Amendment violation that Defendant Bartleson *actually* committed was committed under the 15 Month Rule (setting aside the issue of whether Defendant Bartleson is protected from liability by the doctrine of qualified immunity).  If there was no underlying violation committed by Defendant Bartleson under the 15 Month Rule, then there was no constitutional violation (committed by Bartleson) in which Defendant Wright could have been personally involved.[57]

---

Hepatitis C drug treatment for Plaintiff.  (Dkt. No. 39, Part 7, at 13-33, 47, 49-50 [Ex. D to Defs.' Rule 7.1 Statement, attaching Trans. of Bartleson Depo.].)

[56]     I note that I am not persuaded by Defendants' reply that it is "entirely irrelevant" whether or not the 15 Month Rule caused Plaintiff to not start receiving Hepatitis C drug treatment until March of 2005 because Plaintiff could not tolerate the Hepatitis C drug treatment in March of 2005.  First, it is unclear from the current record whether or not Plaintiff could have tolerated the Hepatitis C drug treatment during the four years before March of 2005, when his liver, gallbladder and kidneys were presumably in a better condition.  Second, whether or not the 15 Month Rule delayed the onset of Plaintiff's Hepatitis C drug treatment is a factual issue distinct from whether or not that treatment had side effects that caused Plaintiff to stop receiving the treatment.

[57]     *See Chavis v. Kienert*, 03-CV-0039, 2005 U.S. Dist. LEXIS 41920, at *36 (N.D.N.Y. Sept. 30, 2005) (Scullin, J.) ("In any event, because the Court has concluded that no violations of Plaintiff's constitutional rights occurred, there is no need for the Court to consider the extent, if any, of Defendant Roy's involvement."); *Manley v. Mazzuca*, 01-CV-5178, 2007

Plaintiff argues that Defendant Bartleson's reliance on the 15 Month Rule violated the

Eighth Amendment because the 15 Month Rule did not "provide for an individualized

assessment of an inmate's likelihood of release as a condition to denying [drug] treatment of

Hepatitis C."  (Dkt. No. 44, Part 7, at 20 [Plf.'s Response Memo. of Law].)  More specifically,

argues Plaintiff, the 15 Month Rule "stated that an inmate's anticipated incarceration must be at

least 15 months from the time of referral," without providing a "definition of 'anticipated

incarceration.'" (*Id*.)  Similarly, Plaintiff argues that the 15 Month Rule was not accompanied by

any training of medical staff in how to determine an inmate's anticipated incarceration.  (*Id*. at

20-21.)  Finally, Plaintiff argues that the 15 Month Rule was not motivated by reasonable

medical considerations.  (*Id*. at 22.)  In support of this argument, Plaintiff cites three cases: (1)

*Salahuddin v. Goord*, 467 F.3d 263 (2d Cir. 2006); (2) *McKenna v. Wright*, 386 F.3d 432 (2d

Cir. 2004); and (3) *Johnson v. Wright*, 412 F.3d 398, 403-06 (2d Cir. 2005).  (*See* Dkt. No. 44,

Part 7, at 20-22 [Plf.'s Response Memo. of Law].)

In *Salahuddin v. Goord*, the Second Circuit held, in pertinent part, "We cannot, as a

matter of law, find it reasonable for a prison official to postpone for five months a course of

---

U.S. Dist. LEXIS 88000, at *13 (S.D.N.Y. Nov. 30, 2007) ("Plaintiff . . . argues that Dr. Lang's
role in the alleged violation constitutes personal involvement for purposes of Plaintiff's claim of
violation of his constitutional rights under § 1983. . . . [This] argument[] fails[], because [it does]
not affect the core question of whether Mr. Manley's Eighth Amendment rights were violated in
the first place.  In other words, because there was no violation of Plaintiff's rights, Plaintiff's
allegations regarding Dr. Lang's . . . personal involvement will not, as a matter of law, suffice to
establish a viable claim under § 1983."); *Burgess v. Garvin*, 01-CV-10994, 2003 U.S. Dist.
LEXIS 14419, at *12 (S.D.N.Y. Aug. 19, 2003) ("On the facts of this case, it is unnecessary to
decide whether a warden who is personally unresponsive to grievances about medical care can be
found to have been personally involved in deliberate indifference that creates intolerable
conditions.  Here, as there was no violation of Burgess's Eighth Amendment rights by anyone,
there is no basis for finding the warden liable on any theory.").

[drug] treatment for an inmate's Hepatitis C because of the possibility of parole without an

individualized assessment of the inmate's actual chances of parole."  467 F.3d 263, 281 (2d Cir.

2006).  What the prison official, a physician named Dr. Piazza, did wrong was simply look at the

plaintiff's parole-eligibility date, not his expected release date (e.g., based on the physician's "best

prediction of what the Parole Board will determine").  467 F.3d at 271.

Granted, what Dr. Piazza did in *Salahuddin* appears to be analogous to what Defendant

Bartleson did here, which was look at the earliest date that Plaintiff could be released on parole

rather than at the actual date that Plaintiff's release was expected.  (*See* Dkt. No. 39, Part 7, at 37-

39 [Ex. D to Defs.' Rule 7.1 Statement, attaching Trans. of Bartleson Depo.].)  For example,

Bartleson testified:

> I would look at the computer at times to see what the dates were, but I
> didn't look at the merit, CR, maxing, whatever.  It was possible release
> is the way it was explained to me to – that it was being done as a
> possibility. . . .  When you say to the nurses, when is – when is this
> guy's earliest release possibility, they say they might get out whatever.
> And that's the number we were using all along, possible release.

(*Id*. at 38.)[58]

However, as Defendants point out, the Second Circuit in *Salahuddin* ultimately found that

Dr. Piazza did *not* violate the Eighth Amendment because of the subjective element of the

deliberate indifference test, discussed in more detail below.  *See*, *infra*, Part III.D. of this Report-

Recommendation.  Specifically, the Second Circuit explained:

---

[58]     For the sake of brevity, I will set aside the fact that I can find no record evidence
that the earliest date to which Plaintiff could be released on parole was in fact a date other than
the actual date that Plaintiff's release was expected (and, therefore, I can find no evidence that
Defendant Bartleson's partial reliance on the 15 Month Rule actually delayed the onset of
Plaintiff's Hepatatis C drug treatment).

> [W]e conclude, upon reviewing the record evidence, that there is no
> genuine factual issue to be tried as to the subjective element, i.e.,
> whether Piazza was aware of a substantial risk that his conduct would
> cause serious harm (and therefore acted with deliberate indifference).
> The evidence in Piazza's favor comes in the form of a letter, dated
> March 20, 2001, written by him to Lakeview Superintendent Moscicki
> in response to Salahuddin's grievance.  In the letter, Piazza expresses
> his belief that because Hepatitis C leads to cirrhosis only over 20 to 30
> years, Salahuddin 'is in no immediate danger' and that 'f[ro]m a
> medical standpoint [,] there is no urgency for [the cancelled liver
> biopsy].'  This may have been an unsound conclusion absent an
> investigation into the progression of Salahuddin's Hepatitis C, but, as
> we have discussed, the mental-state inquiry does not include an
> objective-reasonableness test. . . .  While willful blindness to a risk
> might suggest awareness of the risk, simple blindness does not, and
> leads only to a finding of unactionable negligence.

*Id*. at 281-82.  This aspect of *Salahuddin* is significant to our case because, if there was no

evidence that Dr. Piazza committed an Eighth Amendment violation, there could be no Eighth

Amendment violation (committed by Dr. Piazza) in which any of his superiors could have been

personally involved.

Continuing in my analysis of the cases cited by Plaintiff, in *McKenna v. Wright*, the

Second Circuit held merely that, where a plaintiff alleged that he was denied urgently needed

drug treatment for his Hepatitis C condition because he might be released within twelve months

of starting the drug treatment, he had stated a claim of deliberate indifference to a serious

medical need, sufficient to withstand defendants' Fed. R. Civ. P 12(b)(6) motion to dismiss.  386

F.3d 432, 437 (2d Cir. 2004).  It should be noted that, in *McKenna*, the prison official in

question, a physician named Dr. Lancellotti, based his decision to deny Plaintiff Hepatitis C drug

treatment *solely* on the fact that the DOCS guideline prohibited such treatment for those who

would not remain incarcerated for at least twelve months.  386 F.3d at 434.  As a result, I find

that *McKenna* is distinguishable from our case on two grounds: (1) our case involves the assessment of record evidence under Fed. R. Civ. P. 56, not merely factual allegations under Fed. R. Civ. P. 12(b)(6); and (2) there is no record evidence that, from October of 2003 through October of 2004, Defendant Bartleson denied Plaintiff Hepatitis C drug treatment *solely* because of the 15 Month Rule.

Finally, I find that *Johnson v. Wright* is similarly distinguishable in that it involved a circumstance in which (1) *every* one of the plaintiff's treating physicians indicated to the defendants that prescribing a medication for the plaintiff's Hepatitis C condition was the medically appropriate course of action, and (2) the defendants denied the plaintiff that medication based *solely* on the prison policy in question (which was a substance-abuse policy).  412 F.3d 398, 403-06 (2d Cir. 2005).  I can find no record evidence in this case that either of these circumstances are present here.[59]

Returning to an analysis of our case, as the Second Circuit found with regard to the subjective element of Mr. Salahuddin's Eighth Amendment claim against Dr. Piazza in *Salahuddin*, I can find no evidence in the record that Defendant Bartleson was *aware* that postponing Plaintiff's Hepatitis C drug treatment would be more harmful than administering such

---

[59]      For example, like Defendant Bartleson, Defendant Buttarazzi also found that using medication to treat Plaintiff's Hepatitis C condition was not, at the time, the medically appropriate course of action.  Furthermore, while Dr. Holtzapple, a gastroenterologist, recommended in or about September of 2003 that Plaintiff should start receiving medication to treat his Hepatitis C condition, Defendant Bartleson explained: "[T]he way specialists [like Dr. Holtzapple] work, they deal with their issue, the one issue, which is the liver.  They're not concerned about all the other issues; the kidney, the hypertension, the this and that.  They're more concerned about [how] we treat the liver.  But they don't assess the total picture and that's what our job is, to determine the whole thing."  (Dkt. No. 39, Part 7, at 46, 47 [Ex. D to Defs.' Rule 7.1 Statement, attaching Trans. of Bartleson Depo.].)

treatment.  I make this finding based on the undisputed record evidence establishing Defendant

Bartleson's *subjective beliefs* about (1) the modest success rate of such treatment, (2) the adverse

side effects of such treatment, (3) the risks of harm associated with Plaintiff's age, and (4) risks of

harm associated with Plaintiff's otherwise weakened medical condition.  It may be that Defendant

Bartleson made an error of judgment in delaying requesting Plaintiff's Hepatatis C drug treatment

under the circumstances.  However, as explained above in Part III.B.1.a. of this Report-

Recommendation, deliberate indifference describes a state of mind more blameworthy than

negligence.  Rather, deliberate indifference is a state of mind akin to *criminal recklessness*.  No

rational fact-finder could find such criminal recklessness based on the current record, which

includes undisputed evidence of rather constant testing and monitoring of Plaintiff's various

health problems by Defendant Bartleson between January of 2003 to January of 2005.  Because I

find that there is no record evidence of any underlying Eighth Amendment violation committed

by Defendant Bartleson under the 15 Month Rule, I also find that there is no record evidence of

any constitutional violation (committed by Defendant Bartleson) in which Defendant Wright

could have been personally involved.

For all of the reasons stated above in Part III.C. of this Report-Recommendation, I

recommend that, in the alternative, the Court dismiss Plaintiff's claims against Defendant Wright

based on his lack of personal involvement in the constitutional violations alleged.

### D.    Whether, in the Alternative, Plaintiff's Claims Should Be Dismissed Because He Has Failed to Adduce any Record Evidence Establishing that He Suffered from a Sufficiently Serious Medical Need During the Time in Question

Because I have already found that adequate grounds exists upon which to base a

recommendation that the Court dismiss Plaintiff's claim against Defendants, I need not discuss

Plaintiff's alternative argument in favor of dismissal of that claim, namely, their argument that Plaintiff's claims should be dismissed because he has failed to adduce any record evidence establishing that he suffered from a sufficiently serious medical need during the time in question. However, in the interest of thoroughness, I will discuss that argument.

Defendants argue that, although Hepatitis C is a serious medical condition, the issue before the Court is whether Plaintiff had a serious medical need for drug treatment for his Hepatitis C condition (in that his not receiving such drug treatment would result in further significant injury or the unnecessary infliction of pain). (Dkt. No. 39, Part 16, at 10-11 [Defs.' Memo. of Law].) Defendants further argue that, based on the current record, it is clearly established that it was not urgently necessary that Plaintiff receive such drug treatment during the time in question. (*Id*. at 11-14.)

In response to Defendants' argument that no record evidence exists that Plaintiff suffered from a sufficiently serious medical need, Plaintiff points generally (i.e., usually without providing specific record citations) to seven "facts": (1) the fact that Plaintiff's "medical record[s] [have] repeated references to his Hepatitis C condition"; (2) the fact that Plaintiff "underwent a liver biopsy for the sole purpose of evaluating his Hepatitis C condition for [drug] treatment"; (3) the fact that Plaintiff had "two consultations with a gastroenterologist for the purpose approving [drug] treatment [for] Hepatitis C"; (4) the fact that Plaintiff had "consultations [with] nephrologists who diagnosed [Plaintiff with having] kidney disease secondary to Hepatitis C and recommended its [drug] treatment"; (5) the fact that "eventually . . . Dr. Bartleson, himself, ordered Hepatitis C [drug] treatment"; (6) the fact that Plaintiff "suffered chronic and substantial . . . abdominal pain almost continuously the entire time he was without [drug] treatment for

Hepatitis C," which was so serious as to require the prescription of pain medication; and (7) the fact that Plaintiff "developed renal disease secondary to Hepatitis C."  (Dkt. No. 44, Part 7, at 10-13 [Plf.'s Response Memo. of Law].)

In reply to Plaintiff's response, Defendants argue that Plaintiff did not have a serious medical need for Hepatitis C medication between November of 2001 and January of 2005, because he could not tolerate that medication during that time period.  (Dkt. No. 45 [Defs.' Reply Letter-Brief].)

Defendants' arguments are thoughtful, but ultimately not convincing to me.  Taking their last argument first, Defendants are correct that there is certainly some record evidence that Plaintiff could not tolerate that medication from November of 2001 through January of 2005 (e.g., deposition testimony about the adverse effects of such treatment in general, Plaintiff's age, his otherwise weakened medical condition, and the actual effects he experienced from such medication in March of 2005).  However, there is *some* record evidence disputing that fact.  (*See, e.g.,* Dkt. No. 44, Part 3, ¶¶ 11-14 [Affid. of Scheinbaum, stating that, in his opinion, each of these things did not preclude drug treatment].)

Even if such record evidence did not exist, I would find that Defendants' focus on Plaintiff's need for Hepatitis C *drug* treatment to be too narrow under the circumstances, creating a straw man that Plaintiff can easily knock down.  Here, Plaintiff's Amended Complaint alleges that Defendants intentionally or recklessly failed to treat his Hepatitis C condition between November 2, 2001, and January 27, 2008, for reasons other than medical necessity.  *See*, *supra*, Part I.A. of this Report-Recommendation.  As a result, the issue in this case involves not simply whether Plaintiff needed *drug* treatment for his Hepatitis C condition during the time in question,

52

but whether Plaintiff needed treatment and/or medical care *in general* for his Hepatitis C condition.  As I explained above in Part III.B.1.a. of this Report-Recommendation, my reading of the relevant cases is that such treatment and/or medical care may come in the form of drug treatment, but it may also come in the form of merely the monitoring and testing of the plaintiff (and an attempt to gain better control of his other health conditions).  *See*, *supra*, note 31 of this Report-Recommendation.

In support of their argument, Defendants cite two cases on pages 10 and 11 of their Memorandum of Law.  *See Smith v. Carpenter*, 316 F.3d 178 (2d Cir. 2003) (HIV condition); *Pelletier v. Armstrong*, 99-CV-1559, 2007 U.S. Dist. LEXIS 14894 (D. Conn. March 2, 2007) (Hepatitis C condition).  The problem with *Smith v. Carpenter* is that it stands only for the proposition that, when a prisoner alleges that prison officials have *temporarily* delayed or interrupted the provision of otherwise adequate medical treatment, "it is appropriate to focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious to support an Eighth Amendment claim." *Carpenter*, 316 F.3d at 185.  Furthermore, the Second Circuit in *Carpenter* explained that, "when medical treatment is denied for a prolonged period of time, or when a degenerative medical condition is neglected over sufficient time, the alleged deprivation of care can no longer be characterized as 'delayed treatment' but may properly be viewed as a 'refusal' to provide medical treatment." *Id*. at 186, n.7 [citation omitted].

Here, Plaintiff is not alleging a *temporary* delay or interruption in the provision of otherwise adequate medical treatment for his Hepatitis C condition, but a *prolonged* delay (for three-years and three-months) of drug treatment for his Hepatitis C condition (and a complete

53

absence of the provision of adequate medical treatment for his Hepatitis C condition during that time period).[60]  *Cf. Carpenter*, 316 F.3d at 181 (delay in question was "temporary" because it consisted of delay of seven days on one occasion, and five days on another occasion).  As a result, *Carpenter* does not require this Court to limit its focus on the narrow issue of whether Plaintiff had a need for *drug* treatment for his Hepatitis C condition during the time in question.

Similarly, the problem with *Pelletier v. Armstrong* (apart from the fact that it is not binding on this Court since it was issued by the District of Connecticut) is that it stands only for the proposition that the "fact-specific" issue of whether a person suffering from Hepatitis C possesses a serious medical need (for purposes of the Eighth Amendment) depended, in *Pelletier*, not on whether Hepatitis C in general is a serious medical condition but "whether plaintiff had a serious medical need for treatment [for Hepatitis C]" during the relevant time period.  *Pelletier*, 2007 U.S. Dist. LEXIS 14894, at *35.  In applying this correct recitation of the law to the facts of the case, *Pelletier* did not conclude that such "treatment" must as a matter of law always include *drug* treatment; rather, it found only that the defendants had produced evidence that, during the relevant time period (1993 to 1999), the plaintiff did not meet "the criteria for [Hepatitis C drug] treatment [under the National Institutes of Health Guidelines] from 1993 through 1999" because his liver function tests did not require it.  *Id*. at *36.  Again, it should be emphasized that Plaintiff's Amended Complaint in this action (which was authored by an attorney) alleges that Defendants intentionally or recklessly failed to "treat[]" his Hepatitis C condition between November 2, 2001, and January 27, 2008, for reasons other than medical necessity; his Amended Complaint nowhere expressly uses words such as "drugs," "medication," "Interferon," or

---

[60]     *See*, *supra*, Part I.A. of this Report-Recommendation.

"Ribavirin."  (*See* Dkt. No. 4 [Plf.'s Am. Compl.].)

Finally, even if I were to construe the allegations of Plaintiff's Amended Complaint as limited (by his testimony during his deposition, and his legal arguments in response to Defendants' motion) to an allegation that he was denied treatment for his Hepatitis C condition only insofar as he was denied *drug* treatment for that condition, I would note that, in his Amended Complaint, Plaintiff alleges that he possessed several other medical conditions including "abdominal pain, back pain, fatigue, joint pain, high blood pressure, nose bleeds, diarrhea and blood in his urine" (*see* Dkt. No. 4, ¶¶ 12, 15), and that Defendants deprived Plaintiff of adequate care for his "serious medical needs" (*id*. at ¶¶ 23, 26, 31, 35, 39, 47).  I would note also that numerous cases exist holding that the first issue before the Court in a deliberate indifference case is whether, during the relevant time period, the plaintiff's medical condition, *taken as a whole*,[61] was one "of urgency, one that may produce death, degeneration, or extreme pain."  *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J., dissenting) [citations omitted], *accord*, *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1996), *cert. denied*, 513 U.S. 1154 (1995); *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).[62]

For all of these reasons, I must find that a question of fact exists regarding whether

---

[61]     *See, e.g., Moss v. Nesmith*, 05-CV-1585, 2008 WL 413297, at *5 (N.D.N.Y. Feb. 13, 2008) ("[T]aken together . . . [the plaintiff's] broken ribs and injured knee may be sufficiently serious to constitute a serious medical need.") (Mordue, C.J., adopting Report-Recommendation of Homer, M.J.); *Hall v. Artuz*, 954 F. Supp. 90, 94 (S.D.N.Y. 1997) ("This evidence taken together is sufficient to raise a genuine issue of material fact as to whether [the plaintiff's] physical therapy and knee braces constituted serious medical needs.").

[62]     I would also note that, as Defendants have correctly argued elsewhere in their motion for summary judgment, the record evidence establishes that Plaintiff's medical condition consisted of not only an infection of the Hepatitis C virus (and resulting problems with his liver) but diabetes and problems with his gallbladder, kidneys and blood pressure.

Plaintiff suffered from a sufficiently serious medical need during the time in question.  However,

I also find that this question of fact is immaterial, for purposes of Defendants' motion, because I

have already found several other grounds on which to recommend dismissal of Plaintiff's

Amended Complaint.

> **E.**   **Whether, in the Alternative, Plaintiff's Claims Should Be Dismissed Because He Has Failed to Adduce any Record Evidence Establishing that Defendants Acted with a Sufficiently Culpable State of Mind**

Because I have already found that adequate grounds exists upon which to base a

recommendation that the Court dismiss Plaintiff's claims against Defendants, I need not discuss

Plaintiff's alternative argument in favor of dismissal of those claims, namely, their argument that

Plaintiff's claims should be dismissed because he has failed to adduce any record evidence

establishing that Defendants acted with a sufficiently culpable state of mind with regard to his

medical need.  As a result, I will make only two points about that argument.

First, in response to Defendants' argument that no record evidence exists that Defendants

acted with a sufficiently culpable state of mind, Plaintiff points to the fact that Defendants

Buttarazzi and Bartleson did not give, or cause Plaintiff to receive, Hepatitis C drug treatment

despite knowing that he had Hepatitis C, was in pain, and was experiencing kidney disease as a

result of that Hepatitis C.  (Dkt. No. 44, Part 7, at 14-17 [Plf.'s Response Memo. of Law].)[63]

Furthermore, Plaintiff points to those two Defendants' two justifications for not giving Plaintiff

---

[63]     For example, Plaintiff points to (1) the fact that Defendant Bartleson was aware of Plaintiff's Hepatitis C condition "shortly []after" January of 2003, (2) the fact that Defendant Bartleson noted, in Plaintiff's medical records, his complaints of pain "on numerous occasions," and prescribed Plaintiff "strong pain medication," (3) the fact that Defendant Bartleson noted on October 31, 2003, that Plaintiff was suffering from "Hep C with right kidney atrophy."  (*Id*. at 14-16.)

Hepatitis C drug treatment: (1) that Hepatitis C drug treatment was not advisable in Plaintiff's case due to his other medical conditions (none of which, argues Plaintiff, prevented his receipt of Hepatitis C drug treatment, as a matter of medicine); and (2) that drug treatment was not permitted under the 15 Month Rule (when, in fact, argues Plaintiff, either such treatment was permitted under the 15 Month Rule, or the 15 Month Rule caused a reckless denial of necessary medical care).  (*Id.*)

Second, none of these arguments changes my findings, expressed above in Part III.B. of this Report-Recommendation, that no record evidence exists that any Defendant in this action possessed a sufficiently culpable state of mind (for purposes of the Eighth Amendment) during the time in question.

For these reasons, I recommend that, in the alternative, the Court dismiss Plaintiff's claims against Defendants based on the lack of any record evidence that they possessed a sufficiently culpable state of mind (for purposes of the Eighth Amendment) during the time in question.

**ACCORDINGLY**, it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 39) be **GRANTED**.

**ANY OBJECTIONS to this Report-Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report-Recommendation (unless the third calendar day is a legal holiday, in which case add a fourth calendar day)**.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed. R. Civ. P. 6(a)(2), (d).

**BE ADVISED that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but were not, presented to the Magistrate Judge in the first instance**.[64]

**BE ALSO ADVISED that the failure to file timely objections to this Report-Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered**.  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of H.H.S.*, 892 F.2d 15 [2d Cir. 1989]).

Dated: July 24, 2008
    Syracuse, New York

George H. Lowe
United States Magistrate Judge

---

[64]       *See, e.g., Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137-38 (2d Cir. 1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n.3 (2d Cir. 1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88-CV-5309, 1993 WL 427409, at *18 n.8 (S.D.N.Y. Sept. 30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; s*ee also Murr v. U.S.*, 200 F.3d 895, 902, n.1 (6th Cir. 2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater*, 75 F.3d 1421, 1426 (10th Cir. 1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v. Whitley*, 28 F.3d 532, 535 (5th Cir. 1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] . . . Respondent has waived procedural default . . . objection[].") [citations omitted]; *Greenhow v. Sec'y of Health & Human Servs.*, 863 F.2d 633, 638-39 (9th Cir. 1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty*, 977 F.2d 1347 (9th Cir. 1992); *Patterson-Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 990-91 (1st Cir. 1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].